Dukfee, Judge,
delivered the opinion of the court:
Plaintiff’s deceased husband, Colonel Earl J. Lawler, enlisted in the United States Army in 1918; thereafter was appointed a Beserve officer, and at the time of his release from active duty at age 60 on May 22,1954, had completed 18 and a half years of active service. He filed a petition in this court seeking retirement pay 'by reason of physical disability, and upon his death, his wife was substituted as party plaintiff. The issue is whether Col. Lawler, hereinafter referred to as the officer, was physically unfit for military service at the time of his release from active duty on May 22,1954.
From 1951 to 1954 the officer was hospitalized four times for treatment, principally for arteriosclerosis and hypertension, and also for osteoarthritis of the spine. In 1954 he was additionally hospitalized twice, principally for final evaluation prior to release from active duty.
Following the officer’s last hospitalization in 1954, a medical board reported the following diagnosis:
1. Hypertensive vascular disease, labile, mild; improved. LOD: Yes.
2. Degenerative joint disease (osteoarthritis), multiple mild, cervical and lumbar spine and right great toe cause undetermined, manifested by X-ray changes, headaches, pain in neck and low back; unchanged. LOD: Yes.
3. Pseudo-Menier’s syndrome, manifested by vertigo, headaches, tinnitus; unchanged. LOD: Yes.
4. Arteriosclerosis, general, mild manifested by X-ray changes and questionable changes of cerebral arteriosclerosis. LOD: Yes.
He was reported by the medical board as having become incapacitated for military service on March 5, 1954; that his conditions were incurred hi line of duty, but were not disabling for military service, and that he be returned to general *646 military service commensurate with his age (60) and grade (Lt. Col. CE). Prior to his last hospitalization Colonel Lawler on February 24,1954, requested that he be permitted to appear before a Physical Evaluation Board before separation from service for the purpose of evaluating his disabilities. This request was denied, and he was released from duty on May 22,1954.
The record of frequent and extensive periods of hospitalization of this officer; his recurrent periods of high blood pressure; incapacity and inability to perform his duties, and his medical record of disabling arthritic and heart conditions was certainly evidence such as to require an evaluation by a Physical Evaluation Board, as contemplated by Congress in the enactment of 10 TJ.S.C. §§ 1201-2 (Supp Y, 1952) to determine this officer’s physical fitness to perform his duties. This conclusion is further fortified by the fact that these same conditions were found to be ratable and service connected at 30 percent disabling by the Veterans Administration in the same year, 1954, and later in 1956 at 50 percent, and finally, the fact of the death of this officer in 1962 from a heart attack caused by the same symptoms diagnosed and noted from 1951 to 1954 by the Government.
We also regard as highly significant as to the severity of this officer’s hypertension, arteriosclerosis, arthritis and heart ailment the fact that during the four-year period 1951 to his release in 1954 he was hospitalized for treatment or observation of these conditions at least six times for a total period of 216 days, and was also frequently checked on an outpatient basis. While this officer was hospitalized from May 5,1952, to June 2, 1952, at the Army Hospital in Fort. Eustis, Virginia, a medical notation in his record dated May 9, 1952, stated: “Colonel N. says don’t know what’s wrong. To Valley Forge Army Hospital,” “180/110. Major B..: retire for arthritis and hypertension.”
On June 30, 1953, the officer was advised by the Veterans Administration that his application for disability insurance could not be granted in view of the findings of hypertension.
On May 28, 1954, Colonel Lawler applied to the Army Board for the Correction of Military Records to show en *647 titlement to retirement by reason of physical disability. His application was finally denied, after a hearing before the Correction Board, and its denial was affirmed by the •Secretary of the Army on February 19, 1959. In the opinions submitted by the Surgeon General to the Board, it was concluded that although “this officer did have a ratable disability at the time of separation according to the Veterans Administration Schedule for Bating Disabilities, it was not of such degree as to render him unfit for further military service under the laws, rules, regulations and policies then in effect.” This adverse opinion, rendered without an examination of the officer, did not identify the various conditions diagnosed, or evaluate them as to permanency or degree of severity, or list any facts of record, regulations or policies in support of its conclusions. It does not appear from the record, as evidenced by our Findings of Fact, that specific provisions of the authorized Schedule for Bating Disabilities and amendments thereto were accorded appropriate consideration by the Army authorities charged with the responsibility of properly applying the applicable rating schedule to the disabling conditions involved in this case. When the Surgeon General recommended denial of the officer’s application for correction of his military records in December 1954, the Veterans Administration had already concluded that he had a 30 percent service connected disability — later increased on a combined rating to 50 percent.
In view of the duration, nature, severity and number of Col. Lawler’s permanent disabilities and the denial of his request to appear before a Physical Evaluation Board prior to his release from service, the action of the Board in denying his application for correction of his records, was arbitrary, capricious and not supported by substantial evidence. The action of the Secretary of the Army in approving the finding and recommendations of the Army Board for the Correction of Military Becords was likewise arbitrary, •capricious and not supported by substantial evidence.
On the basis of the evidence of record, the Trial Commissioner has found that Col. Lawler, “at the time of his relief from active duty on May 22, 1954, was not physically fit to *648 perform the duties of his office, grade, rank or rating as provided in the applicable statutes and Army regulations in effect at that time.” We have reached the same conclusion.
Plaintiff is entitled to judgment for retirement pay at the rate of 75 percent of the pay of a colonel with over 18 years of service from May 22, 1954, to April 5, 1962, less such amounts as have been paid Colonel Lawler by the Veterans Administration as disability compensation, such amount to be determined under the provisions of Rule 47(c).
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Eleanor B. Lawler is the widow of the late Earl J. Lawler and the substituted plaintiff by reason of the death of Earl J. Lawler during the pendency of this proceeding. Mrs. Lawler is a resident of the State of Kansas, living at 5310 West 49th Terrace, Shawnee Mission, Kansas.
2. This claim was filed pursuant to the provisions of Title 28, United States Code, Section 1491; Title 4 of the Career Compensation Act of 1949, as amended (Public Law 351,81st Congress), and other pertinent statutes. Colonel Lawler had active World War service prior to November 12, 1918, and the claim is for 75 percent of the salary of a Colonel with over 18 years of service.
3. Colonel Lawler was bom in the United States on February 8, 1894. He enlisted in the United States Army on April 4, 1918, and served to and including August 21, 1919. He accepted an appointment as a Captain, Corps of Engineers, Officers Reserve Corps of the United States Army, March 20, 1937, and remained in the United States Anmy Reserve until relieved by reason of age (over 60) on May 22, 1954. Pie entered upon extended active duty on April 25, 1941, and served until April 4,1946, when he reverted on that date to an inactive duty status. He was recalled to another period of extended active duty on August 18, 1946. At the time of his relief from this second period of extended active duty on May 22,1954, he had completed more than 18 years *649 and 6 months of satisfactory service under the provisions of Title III, Public Law 810, 80th Congress. At the time of Colonel Lawler’s relief from active duty on May 22,1954, he had attained the rank of Colonel in the United States Army Reserve.
4. On February 11, 1941, in connection with his entry on active duty, Colonel Lawler was found to be physically qualified for general military service.
5. Colonel Lawler was hospitalized during his military career as follows:
(a) Fort Eustis, 9 days (undetermined) prior to 1948.
For observation of disease of cardio-vascular symptoms.
Impressions: Labile blood pressure influenced by emotional stress.
(b) Fort Eustis, March 10-April 5, 1951.
Initial complaint: Headaches and dizziness.
Working diagnosis: Cerebral arteriosclerosis, mild hypertension.
During hospitalization an electrocardiograph was reported normal; N-rays of the sinuses and thorax, normal; X-ray of chest indicated calcifi-cations in both lungs, and a flattening of both leaves of the diaphragm suggesting emphysema, numerous laboratory tests, and consultation reports are of record.
Final Diagnosis: Generalized arteriosclerosis.
Disposition: Transferred to Valley Forge Army Hospital.
(c) Valley Forge Army Hospital, April 9-July 2,1951.
Admitted on transfer from Fort Eustis Hospital for treatment of cerebral arteriosclerosis.
Hospitalization included a complete medical checkup including electrocardiograph, Ear Nose and Throat Clinic, Eye Clinic, Psychological Consultation, Laboratory tests, N. P. service consultation and X-rays of Paranasal sinuses and lungs.
Final Diagnosis: Hypertensive vascular disease, arteriosclerosis, and anxiety reaction.
Disposition: Duty.
( d) Fort Eustis, May 5-June 2,1952.
Admitted following outpatient treatment from April 15, 1952, for osteoarthritis of spine, generalized arteriosclerosis and hypertension.
*650 Hospitalization: Outpatient and hospital treatment included an X-ray of spine showing hypertrophic changes, electrocardiograph within normal limits, psychiatric examination.
Final Diagnosis: A medical board at the. hospital found the officer fit for full duty (there is no record of a formal Board).
Disposition: Duty.
(e) Fort Belvoir, January 13-26,1954.
Admitted prior to retirement (for age) of officer.
Hospitalization: Treatment and examination in connection with this hospitalization and final processing — the officer was examined in the Ear Nose and Throat Clinic, submitted to an EEG, laboratory tests; Barium enema, gall bladder X-ray, Chest X-ray, X-ray of spine, electrocardiograph,. neurologist consultation.
Disposition: Duty.
(f) Fort Belvoir, March 2-4,1954.
Admitted for purpose, of transfer to Walter Reed for final disposition.
(g) Walter Reed Army Hospital, March 4-May 6,1954.
Admitted for the purpose of final evaluation prior to release from active duty.
Hospitalization: A “work up” for hypertension and possible ear disease was started on March 11,1954, the EEG was recorded as normal, the Ear Nose and Throat Clinic recorded a diagnosis of Pseudo-Meniere’s Syndrome, the Neurology Clinic noted that “a diagnosis of cerebral arteriosclerosis is suspected,” the orthopedic clinic found “degenerative joint disease, multiple, mild, not incapacitating for military duty and is certainly commensurate with this man’s age” and recommended return to duty. X-ray report showed hyper-trophic osteoarthritis, cervical spine and lum-bosacral articulation, with no evidence of pathologic change in the ear. The officer’s profile serial was 1-1-1-2-1-1.
Diagnosis: “Hypertensive vascular disease, labile, mild; improved. Degenerative joint disease (osteoarthritis), multiple, mild, cervical and lumbar spine and right great toe; unchanged. Manifested by X-ray changes, headaches, pain in neck and low back. Pseudo-Meniere’s syndrome, manifested by vertigo, headaches, tinnitus; unchanged. Arteriosclerosis, general, mild, manifested by X-ray changes and questionable changes *651 of cerebral arteriosclerosis; unchanged. Presbyopia.”
Colonel Lawler was, on May 6, 1954, recommended for General Military Service commensurate with his age and grade.
6. The records disclose the following blood pressure readings of Colonel Lawler from 1947 until the date of Ms release:

*652 7. (a) On April 21, 1952, an X-ray of Colonel Lawler’s spine showed hypertrophic arthritic changes involving C-2 through T-l and a diagnosis of arthritis, hypertrophic, cervical spine was noted. However, three medical doctors agreed that plaintiff was fit for duty and he was returned to duty.
(b) On the November 30, 1953, physical examination in connection with retirement, the examiner noted “Degenerative joint disease, spine mild.” The accompanying X-ray report was interpreted as follows:
right foot: cervical & lumbar spiNe: There are marked hypertrophic changes seen in the cervical spine with narrowing of the joint spaces between C-3 through D-l. There is also a considerable hypertrophic spurring and bony density about the joint space of L-5 and S-l. Abdominal aorta is partially calcified.
right foot : Film of the right foot shows narrowing of the joint space between the 1st metatarsal and the proximal phalanx with considerable bony ebumation about the joint surfaces. The remainder of the foot shows no evidence of bone change.
(c) At the orthopedic clinic at Walter Eeed Hospital on March 23,1954, the consultant reported:
physical examination reveals normal neck and spine. No neurological changes. X-rays reveal minimal osteo-arthritic changes in the cervical and lumbar vertebra. There is osteophytosis about the bodies of the cervical vertebra. There is narrowing of the L-5, S-l j oint with osteophytosis about the body of the vertebra.
impression: Degenerative joint disease, multiple, mild, not incapacitating for military duty and is certainly commensurate with this man’s age.
recommendations. Eetum to military duty.
(d) The final diagnosis at the hospital and the diagnosis of the Disposition Board of May 6,1954, was:
Arteriosclerosis, general, mild, manifested by X-ray changes and questionable changes of cerebral arteriosclerosis ; unchanged. LOD: Yes.
In both instances, the recommendation was “General Military Service commensurate with his age and grade.” The physical profile was indicated as 1-1-1-2-1-1.
*653 8. Meniere’s syndrome, mild, was noted for the first time on the final physical examination on November 30, 1953. During Colonel Lawler’s subsequent hospitalization at Fort Belvoir, the neurologist made a diagnosis of Meniere’s syndrome, mild. The Disposition Board (May 6, 1954) noted a diagnosis of Pseudo-Meniere’s syndrome, and a clearance for duty by the Ear Nose and Throat Clinic. In testifying before the Correction Board, Colonel Lawler stated that the condition was not active in 1954 when he was released from duty.
9. An annual physical examination undertaken on April 8,1948, resulted in a report that the officer was then qualified for general military service. His blood pressure was recorded as 164/94. The same report indicates that blood pressure readings were taken on April 9, 10, and 11, 1948, A.M. and P.M., and reported as follows: “120/90, 140/90; 150/ 100, 140/108; 140/96, and 128/90.” The officer had been hospitalized for 9 days for observation which revealed no evidence of disease of the cardiovascular or cardiorenal systems. The “impression” was recorded as: “Labile blood pressure, influenced by emotional stress, within limits of normal.”
10. In further reference to the summary of various periods of hospitalization set out in Finding 5, the record shows that when he was admitted on March 10, 1951, to the Army Hospital, Fort Eustis, Virginia, Colonel Lawler’s chief complaint was dizziness on turning his head from side to side, slight weakness, and frontal and temporal headaches. He stated that since January 1950 he had suffered from intermittent frontal headaches. He further reported that episodes of dizziness occurred on March 8 and 9,1951.
The Eye Nose and Throat Clinic found no disease to explain the headaches and vertigo. It was also reported that his blood pressure, which on physical examination ranged between 158/98 and 168/102 “fell a few points each day” and by March 19, 1951, was down to 144/86 and remained normal thereafter; his dizziness decreased; the Kombergtest was “suggestive, he sways slightly”; on many days he had no headaches, but if he turned his head suddenly to the left on some occasions, he still experienced a “little dizziness”; a deci *654 sion was made to transfer him for a more extensive neurological examination. The diagnoses reported on March 26,1951, were: “(1) Arteriosclerosis, generalized. Mild, generalized arteriosclerosis with symptomatology presumably due to cerebellar arteriosclerosis. (2) Mild transitory hypertension. (3) Possible old inactive calcification lesions of pulmonary tuberculosis.”
11. During the period April 9, 1951, to July 2, 1951, the officer was hospitalized at Valley Forge Army Hospital for study and treatment for “cerebral arteriosclerosis.” His chief complaint was dizziness which had begun one month prior to admission, especially when his head was turned to the left. Physical examination reported (1) a blood pressure of 180/100; (2) moderate sclerotic changes in the retinal arteries; and (3) mild thickening of the peripheral arteries. At the same time of discharge from the hospital, it was reported that “his blood pressure was found to average around 160/100.”[1] He was returned to duty following this period of hospitalization.
12. On April 15,1951, at Fort Eustis, Virginia, the officer was seen for complaints of inability to concentrate, occipital headache, and high blood pressure. Physical examination disclosed a blood pressure reading of 180/100; mild tenderness in the high cervical spine; and mild hardening of the arteries with respect to the peripheral vessels. The “impression” reported was: (1) Osteoarthritis of the cervical spine; (2) Mild, generalized arteriosclerosis; and (3) Hypertension, benign, mild, 180/100. An X-ray taken on April 15, 1952, indicated that the officer had “advanced hypertrophic arthritic changes of the 0 spine with intervertebral disc changes.” On April 21,1952, X-ray examination reported, in pertinent part, that the spine showed hypertrophic arthritic changes involving C-2 through T-l. EKG was within normal limits. The diagnosis was: (1) Osteoarthritis, advanced, cervical spine; (2) Mild generalized arteriosclerosis; and (3) Hypertension, benign, mild with blood pressure 180/100. Under “recommendations” it was stated: “This patient is not *655 thought to be physically fit for overseas duty, and such duty would be hazardous to his health. He should be hospitalized for further evaluation and consideration by a medical board.” In a note dated April 29, 1952, it was stated that the officer was to be admitted to the hospital to meet a medical board pursuant to the request of the hospital commander.
13. During the period May 5, 1952, to June 2, 1952, the officer was hospitalized at the Army Hospital, Fort Eustis, Virginia. On May 9,1952, a notation was made that “Colonel N. says don’t know what’s wrong. To Valley Forge Army Hospital,” “180/110. Major R.: retire for arthritis and hypertension.” On May 12,1952, his blood pressure was reported as 204/118; 160/100 on May 15, 1952; 172/102 on May 17,1952; and 174/100 on May 19,1952.
On May 31, 1952, it was stated that a complete study of the officer failed to reveal any permanent defect which would warrant his discharge. It was also stated that blood pressure “was elevated most of the time but has been found normal repeatedly.” The opinion was expressed that the headaches experienced by the officer were due to cervical arthritis and tension. On June 2, 1952, the officer was returned to duty , at which time the diagnoses reported were: “(1) Observation medical for arteriosclerosis and hypertension, Labile essential hypertension present” and “ (2) Arthritis, n.e.c. hypertrophic of cervical spine.”
14. On June 30, 1953, the officer was advised by the Veterans Administration that his application for disability insurance had been considered but the granting of such insurance was precluded under the good health requirement prescribed by law and regulations in view of the finding of hypertension.
15. On November 30, 1953, a physical examination was conducted at the Army Hospital, Fort Belvoir, Virginia. Defects reported at that time were: (1) Hypertensive vascular disease, mild, benign; (2) Meniere’s syndrome, mild; [2] *656 (3) Degenerative joint disease, cause unknown, spine mild. The physical profile was 3-1-2-2-1-1. He was reported as being qualified for general military service.
16. On December 2, 1953, a radiographic report of the right foot, cervical spine, and lumbar spine stated, in pertinent part, as follows:
right eoot: cervical & lumbar spiNe: There are marked hypertrophic changes seen in the cervical spine with narrowing of the joint spaces between C-3 through D-l. There is also a considerable hypertrophic spurring and bony density about the joint space of L-5 and S-l. Abdominal aorta is partially calcified.
right foot : Film of the right foot shows narrowing of the joint space between the 1st metatarsal and the proximal phalanx with considerable bony eburnation about the joint surfaces. The remainder of the foot shows no evidence of bone change.
17. On December 10, 1953, at Fort Belvoir, Virginia (Medical Clinic), the officer’s blood pressure was reported as 170/104. An opinion was expressed to the effect that the officer should be hospitalized for further studies.
On January 13,1954, at the United States Army Hospital, Fort Belvoir, Virginia, the officer underwent a neurological evaluation. The reason for the requested examination was a history of left-sided headaches, dizzy spells, and blackout sensation when lying on left side. “Apparently has positive Romberg 1951-1952. Also has roaring in both ears. EEGr negative.” The following history was also reported:
History of dizziness when arising from bed in March, 1951. Dizziness was more or less present every time patient moved or turned head toward the left. Was not a true vertigo but seemed like everything “flickered like TV.” Dizziness was so severe he entered the Fort Eustis Hospital where he was sedated. Dizziness remained and patient was transferred to Valley Forge where he stayed for 3 months. No medication was given. Dizziness left around first of June, 1951, but returned in July while on leave. May have some nausea with dizzy attacks and has noted diplopia on occasion with the dizzy spells. (Has noted four headlights for approaching automobile at night.)
Patient dates trouble back to January, 1950, when he had a “virus” infection for a few days. Following this *657 patient had periodic headaches starting in occipital region and radiating forward to end behind both eyes. At, or shortly after this time, he developed tinnitus bilaterally which has been more or less constant and is still present. These headaches are not related to attacks of dizziness. While patient is having severe dizzy spell, he walks like he has been drinking but has not noted any tendency to fall in a certain direction. No gross hearing difficulty. Dizzy attacks last 3-4 weeks now. Hasn’t been dizzy for 5 weeks.
Nystagmus on lateral gaze bilaterally was reported as having been found by the examining physician as well as diminution of hearing; X-ray of the cervical and lumbar spine showed hypertrophic changes and narrowing of the joint spaces, the abdominal aorta was partially calcified,[3] and the right foot showed narrowing of the joint spaces and hyper-trophic changes.
The impression report by the examining neurologist was: “Meniere’s syndrome with bilateral involvement, mild.”
18. In a consultation report dated January 26, 1954, following hospitalization from January 13 to 26, 1954, at the United States Army Hospital, Fort Belvoir, Virginia, the officer’s blood pressure was reported as 170/110 on admission ; 160/100 and 160/96 on discharge from hospital; and 170/104 in the outpatient clinic. The impression reported was: “hypertensive vascular disease, mild, benign; degenerative joint disease, cause unknown, spine, mild; and history of possible Meniere’s present.” It was reported that following consultation with the Chief of Medicine that the officer had no disability that would prevent him from duty under SR 40-120-1 and felt that there was no justification at that time for transfer to Walter Reed Army Hospital.[4]
*658 A review of the officer’s medical records shows that during the period April 9,1951, and May 6,1954, the officer was hospitalized on an inpatient basis on at least six occasions for a total of 216 days; he was also frequently seen on an outpatient basis.
>19. In a letter to the Commanding General, The Engineer Center, Fort Belvoir, Virginia, dated February 24, 1954, Colonel Lawler requested that he be permitted to appear before a Physical Evaluation Board prior to separation from the service for the purpose of evaluating his disabilities. He cited the following: Meniere’s disease; hypertension; arthritis of the neck, back, and right foot; and chronic headaches.
20. On March 2,1954, the officer was admitted to the Army Hospital, Fort Belvoir, Virginia, where he remained until March 4, 1954, on which date he was transferred to Walter Beed Army Hospital.
The diagnoses reported on March 4, 1954, all of which were found to have been incurred in the line of duty, were:
(1) Hypertensive vascular disease, benign, mild.
(2) Degenerative joint disease, spinal, due to unknown cause.
(3) Degenerative joint disease, multiple, right foot, due to unknown cause. •
(4) Arteriosclerosis, general.
(5) Deafness to high tones, n.e.c., mild.
(61 Meniere’s syndrome, mild (history).
(7) Chronic external otitis.
21. On February 24, 1954, Colonel Lawler requested that he be permitted to appear before a Physical Evaluation Board. He was then hospitalized at Walter Beed Army Hospital. An admission note dated March 5,1954, recorded the following:
In 1951 he suddenly developed dizziness on awakening one morning and getting out of bed. Dizziness was especially bad when lying in bed at night and turning to the left. * * * He “blacked out”. He noticed si. memory impairment and inability to concentrate. He also has constant tinnitus and frequent headaches, usually in the neck radiating to the left side of the head. On one occasion he noted diplopia.
*659 Following the period of hospitalization, the officer’s case was submitted to a medical board on May 6, 1954, at which time the following diagnoses were reported:
1. Hypertensive vascular disease, labile, mild; improved. LOD: Yes.
2. Degenerative joint disease (osteoarthritis), multiple' mild, cervical and lumbar spine and right great toe cause undetermined, manifested by X-ray changes, headaches, pain in neck and low back: unchanged. LOD: Yes
3. Pseudo-Meniere’s syndrome, manifested by vertigo, headaches, tinnitus; unchanged. LOD: Yes.
4. Arteriosclerosis, general, mild manifested by X-ray changes and questionable changes of cerebral arteriosclerosis. LOD: Yes.
The medical board reported that (1) the officer became incapacitated for military service on March 4,1954; (2) his conditions were incurred in line of duty; (3) none of the conditions was disabling for military service; and it was recommended that he be returned to general military service commensurate with his age (60) and grade (Lt. Col. OE). Plaintiff was subsequently released from duty without a Physical Evaluation Board on May 22, 1954.
22. (a) On May 28, .1954, Colonel Lawler made application to the Army Board for the Correction of Military Becords to correct his military records to show entitlement to retirement by reason of physical disability.
(b) In conjunction with the application for correction of military records in 1954 and at the request of the Army Board for Correction of Military Becords, the Surgeon General’s Office, on December 10, 1954, furnished an advisory opinion wherein it was stated in pertinent part:
It is the opinion of the Surgeon General that although this officer did have a rateable disability at the time of separation according to the Veterans Administration Schedule for Bating. Disabilities, it was not of such degree as to render him unfit for further military service under the laws, rules, regulations, and policies, then-in effect.
The officer’s application for correction of military records was denied in 1955, without a hearing.
*660 (c) Upon request for further consideration of the application, the Army Board for Correction of Military Becords on December 3, 1958, conducted a hearing.
At the hearing conducted by the Army Board for Correction of Military Becords, a supplemental opinion from the Surgeon General’s Office, dated August 13, 1958, stated in pertinent part as follows:
There is no additional tangible evidence presented at this time which changes the opinion of the Surgeon General as expressed in comment dated 10 December 1954 to the effect that at the time of separation Lt. Colonel Lawler was physically fit for general military service commensurate with his age and grade, the defects present at that time not warranting retirement for medical reasons. Furthermore, it is the expressed opinion of this office that error or injustice is not demonstrated in the medical aspects of this case.
(d) Colonel Lawler appeared, with counsel, and testified in his own behalf and submitted testimony of medical doctors relative to the history, nature, course, and degree of severity of his disabilities before the Army Board for Correction of Military Becords on December 3, 1958.
(e) The Board concluded:
1. That the applicant was given a thorough physical examination prior to his relief from active duty and found fit for general military service commensurate with his age and grade.
2. That it concurs in the opinion of the Surgeon General’s Office that error or injustice has not been demonstrated in the medical aspects of the applicant’s relief from active duty.
3. That in consideration of the foregoing findings and conclusions, there is no material error or injustice in the applicant’s relief from active duty, not by reasons of physical disability.
and recommended:
That in the case of EABL J. LAWLEB, his application for correction of military records be denied.
23. On February 19, 1959, the Secretary of the Army approved the findings, conclusions, and recommendations of the Army Board of Correction of Military Becords, denied *661 the application, and advised Colonel Lawler of the action taken.
24. Colonel Lawler served as Post G-4 (supply chief) at Fort Eustis from 1951 to 1953, and as Executive Officer, Fort Story, prior to serving as Commandant of the Headquarters Company at Fort Belvoir, a position he held at the time of his release. His assignment did not require active field duty, but was primarily administrative in nature. One efficiency report indicates additional duties of a member of Central Post Fund Council, Exchange Council, and Work Simplification Program Officer. The final report has the following comment:
An elderly officer who is not in good health. * * * This is a mature, easy going, conscientious officer who accomplishes his duties in a superior manner. His physical limitations have not interfered with his present assignment.
It thus appears that, regardless of his physical limitations, Colonel Lawler did perform the non-arduous duties of his administrative assignment in a superior manner. Following Colonel Lawler’s release from active duty, he was reemployed in his former position of District Storekeeper with the Eock Island Eailroad and served in that capacity until his retirement from such civilian employment in 1959.[5]
25. On April 5, 1962, Colonel Lawler died. The final diagnosis reported by the Department of Pathology, Providence Hospital, Kansas City, Kansas, was:
CAUSE OF DEATH:
1. Severe generalized atherosclerosis with calcific coronary arteriosclerosis.
2. Occlusion of the anterior descending branch of the left coronary artery by thrombosis.
3. Anteroseptal myocardial infarction.
4. Eupture of the myocardial infarction with massive hematopericardium.
CONTRIBUTING findings: Eecent occlusions of the cir-cumflax branch of the right coronary artery by hemorrhage into an atheromatous plaque.
*662 INCIDENTAL eindings : Arterial sclerotic aneurysm of the abdominal aorta; acute mucosal ulcerations of the stomach with gastro-intestinal .hemorrhage; benign prostatic hyperplasis.
' 26. The medical evidence available to .the physicians who examined plaintiff at the time of his relief from active duty was such as to warrant an appearance before and an evaluation by a Physical Evaluation Board as contemplated by the provisions of 10 U.S.C. 1201 and/or 1202 in order to determine his fitness to perform the duties commensurate with his office, grade, rank, or rating.
27. It does not appear from the record that specific pro-lusions of the authorized Schedule for Bating Disabilities and amendments thereto were accorded appropriate consideration by the Army authorities charged with the responsibility of properly applying the applicable rating schedule to the disabling conditions involved in this case.
The various conditions diagnosed were not identified nor evaluated as to permanency or degree of severity in the opinions furnished by the Surgeon General. No facts of record were listed and no law, rules, regulations, or policies were cited in support of those opinions.[6]
28. By a majority opinion dated August 17, 1954, a Veterans Administration rating board assigned an evaluation *663 of 10 percent for arthritis, hypertrophic, cervical spine, with limitation of motion and 10 percent for hypertension, which resulted in a combined rating of 20 percent effective May 23, 1954. A member of the rating board dissented from the majority opinion with respect to the denial of service connection for a condition of the hmibar spine, making the following comment:
Except for approximately three months the veteran had continuous service from April, 1941, to May, 1954. Veterans Administration examination approximately two months after discharge shows radiologist’s impression of localized area of osseous reaction, probably secondary to congenital anomaly. X-ray shows narrowed interspace at L-5, S-l. There is lipping of the anterior aspects and to a lesser extent of the lateral aspects of the last two vertebral bodies. There is a 50% limitation of motion of the lumbar spine. Even though the condition is congenital, considering the length of service and the condition being found less than two months after discharge service connection by way of aggravation should be granted and evaluated as 20% disabling under Diagnostic Code 5292.
Upon reconsideration of the initial rating as directed by the Assistant Deputy Administrator of Veterans Affairs, the issue with respect to service connection for arthritis of the Tmnbar spine was reviewed and service connection allowed for that condition. This amended decision, which also became effective May 23, 1954, resulted in a combined rating of 30 percent from the day following the date of. separation from active service, i.e., May 23, 1954.
Subsequently, service connection was allowed for Meniere’s syndrome and that condition was evaluated at 30 percent. The rating for that condition was made effective May 18, 1956, although the record shows that the officer suffered from symptoms of Meniere’s disease during his military service as early as 1951. The amended combined rating, after service connection was granted for Meniere’s disease, was 50 percent.
29. On the basis of the evidence of record, it is found that plaintiff, at the time of his relief from active duty on May 22, 1954, was not physically fit to perform the duties of his *664 office, grade, rank, or rating as provided in the applicable statutes and Army regulations in effect at that time.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover retirement pay at the rate of 75 percent of the pay of a colonel with over 18 years of service from May 22, 1954, to April 5, 1962, less such amounts as have been paid plaintiff by the Veterans Administration as disability compensation, and judgment is entered for plaintiff to that effect with the amount of recovery to be determined pursuant to Rule 47 (c) of the rules of this court.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on June 8, 1965, that judgment for the plaintiff be entered for $42,686.91.

 Under Extension #7 to the applicable Schedule for Rating Disabilities, dated July 6, 1950, the rating for arteriosclerosis, general, was changed from 10% to 20% (Code 7100), and for essential arterial hypertension with diastolic pressure consistently over 100, the authorized rating is 10% (Code 7101).

 Meniere’s disease is defined as a disease of tlie inner ear (the innermost of the three parts into which the hearing apparatus is divided). It is characterized by attacks of dizziness, ringing in the ears, deafness, peculiar movements of the eyes (from side to side), and vomiting. The attacks come on at irregular intervals. The cause of the disease is not fully understood. (Page 493, “Schmidt’s Attorney’s Dictionary of Medicine”, 1962; Dorland’s Medical Dictionary, 22d Edition.)

 See autopsy report, Finding No. 25.

 The regulation governing the standard of fitness and unfitness for retention on active duty, SR 40-120-1, dated October 9, 1953, made no provision for a diagnosis of Meniere’s syndrome. AR 40-504, dated June 28, 1955, ■which superseded SR 40-120-1, in Par. 11, Sec. Ill, made provision for Meniere’s syndrome and stated as follows: “If the syndrome is of a mild degree, is infrequent or controllable by treatment, and if hearing in better ear is within acceptable prescribed limits (par. 8) the member is usually considered fit for retention in the military service. Members who have severe recurring attacks who are not adequately controlled by treatment or who require hospitalization of sufficient frequency to materially interfere with military duties are usually deemed unfit for further military service.”

 Colonel Lawler was released from active duty because he had attained the age of 60 years. He resumed his former civilian position, and five years later was retired for age.

The following quotations are taken from pages 1-3 of the Schedule for Rating Disabilities, 1945 Edition, as amended:
“GENERAL POLICY IN RATING DISABILITY
* * # # £
“3. Resolution of Reasonable Doubt. — * * * When after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant.
“By reasonable doubt is meant one which exists by reason of the fact that the evidence does not satisfactorily prove or disprove the claim, yet a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility. It is not a means of reconciling actual conflict or a contradiction in the evidence; the claimant is required to submit evidence sufficient to justify a belief in a fair and impartial mind, that his claim is well grounded. Mere suspicion or doubt as to the truth of any statements submitted, as distinguished from impeachment or contradiction by evidence or known facts, is not a justifiable basis for denying the application of the reasonable doubt doctrine if the entire, complete, record otherwise warrants invoking this doctrine. * * *
“7. Higher of Two Ratings. — If there is a reasonable doubt, as above defined, as to which of two ratings shall be applied in any given ease, the claimant is entitled to the higher.”