Per Curiam:
In this suit plaintiff challenges the action of the United States Air Force by which his records were corrected in November 1958, to show that he was discharged in September 1953, with a 20 percent permanent physical disability rating, with entitlement to severance pay benefits, rather than with at least a 30 percent permanent physical disability rating, to which he claims entitlement with corresponding disability retirement pay under the Career Compensation Act of 1949.[1]
*204 The facts, detailed in the accompanying findings, may be summarized as follows:
On September 7, 1953, plaintiff Was physically examined by the Air Force. The medical report noted certain physical defects as 'a result of wounds which he sustained as a pilot in World War II. He was, however, on September 16,1953, relieved from active duty as the result of a reduction-in-force program, but not by reason of physical disability.
On January 10,1955, the Veterans Administration awarded plaintiff a disability rating under the VA Diagnostic Code as follows:
20% Scars, shell fragment wounds, left thigh.
10% Scars, shell fragment wounds, left leg.
10% Scars, left hip, left knee, ankle, right shoulder and arm.
10% Paralysis, mild, common peroneal nerve.
Combined rating 40% from September 17, 1953.
On February 25, 1958, the Veterans Administration amended plaintiff’s disability rating as follows:
20% Paralysis, incomplete, common peroneal nerve, left, moderate.
10% Wound, MG XIII, left, moderate.
10% Wound, MG XI, moderate, right.
10% Scar, right shoulder, with retained foreign body.
0% Scars, left lower extremity.
0% Scars, right upper extremity.
Combined rating 50% from December 30, 1957.
On November 14, 1958, the Assistant Secretary of the Air Force approved a recommendation of the Air Force Board *205 for the Correction of Military Records, pursuant to which plaintiff’s records were corrected to show that he was discharged in September 1953, by reason of physical disability with entitlement to severance pay benefits, and with a 20% disability rating under the VA Diagnostic Code consisting of 10% for paralysis, external popliteal nerve,[2] left, mild; and 10% for muscle injury, left, moderate.
In this court plaintiff contends that he was entitled to be rated by the Air Force for scars and other defects, rated by the Veterans Administration, but which the Air Force did not rate because both the Surgeon General and the Correction Board found that they did not contribute to plaintiff’s unfitness.
On October 15, 1970, after the parties had argued before the court their exceptions and briefs in response to the report filed August 27, 1969, by the late Commissioner Richard Arens denying the plaintiff’s petition for military disability retirement pay, the court ordered the case remanded to a trial commissioner for further proceedings to determine the “administrative interpretation by the Air Force (Air Force Board for the Correction of Military Records and Air Force Physical Evaluation Boards) of Air Force Manual 35-4, par. I7a(l) and (2), since its promulgation in 1952, as that interpretation bears on the issue in this case.”
The case was then referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on January 19, 1972. Exceptions were filed by both parties and the case has been resubmitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, it hereby adopts the same, together with the foregoing and together with the first twenty (20) findings, those made by Commissioner Arens, with a change in finding 20, as the *206 basis for its judgment in this case, as hereinafter set forth. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff in accordance with this opinion with the amount of recovery to be determined pursuant to Rule 131(c).
OPINION OP COMMISSIONER
Bernhardt, Commissioner:
Pursuant to the order of remand further testimony, exhibits and briefs were received, on the basis of which it is concluded that the Correction Board was procedurally remiss in failing to announce a rating for the plaintiff’s scar on his right shoulder with foreign body retained, that the said defect was properly ratable at 10 percent under the VA Schedule for Rating Disabilities, 38 C.F.R., and that with such addition to the 20 percent disability recommended by the Correction Board, the plaintiff is entitled to disability retirement pay for 30 percent disability under Section 402 (b) of the Career Compensation Act of 1949, 63 Stat. 802, 817, 37 U.S.C. § 272(b).
Paragraphs 17 a and b of AFM 35-4, set forth in finding 18,[1] provide as follows:
17. Recommended Findings
a. Determination of Physical Fitness. At the close of the hearing, the board will go into closed session for the purpose of arriving at initial recommended findings on whether the evaluee is fit or unfit to perform the duties of his office, rank, or grade. The recorder and counsel will not be present in the closed sessions. After making the initial recommended finding, the board will determine the diagnosis and severity of each physical defect noted which is considered permanent or may be permanent in nature. These defects will be placed in the following categories.
(1) Disabling — Any defect which in itself rendered the evaluee unfit to perform the duties of his office, rank, or grade.
(2) Contributory — Any defect other than a disabling defect which may be classed as permanent or may be permanent in nature.
*207 b. Percentage of Physical Defects. Having categorized the physical defects as indicated in a (1) and (2) above, the board will determine the percentage for each physical defect in accordance with the standard schedule of rating disabilities in current use by the Veterans’ Administration, whether the defect was due to the intentional misconduct or willful neglect of the evaluee, and whether the defect was incurred during a period of unauthorized absence of such evaluee.
The parties and their respective experts agree that the practice of the Air Force under the foregoing AFM 17 a and 5 and its predecessor regulations has at all times been, as indeed the plain language requires, that once a determination has been made by the Air Force that a member is “unfit to perform the duties of his office, rank, or grade”, the Physical Evaluation Board — and this perforce applies equally to the 'ascending hierarchy of service retirement boards, including the Correction Board at the end of the administrative journey — “will determine the diagnosis and severity of each physical defect noted which is considered permanent or may be permanent in nature.” [Emphasis supplied.] This is consistent with Wales v. United States, 132 Ct. Cl. 765, 130 F. Supp. 900 (1955). Just as this obligation of the service to make a determination as to each physical defect is mandatory in form, so is the further requirement of the regulation that all of the known defects be placed in the categories of “disabling” or “contributory”, which categories together embrace permanent or potentially permanent service-incurred physical defects of all manner, whether unfitting for military duty or an impediment to civilian livelihood. Having thus slotted the disabilities as “disabling” or “contributory”, the service will then under paragraph 17 b of 35-4 AFM “determine the percentage for each physical defect in accordance with the standard schedule of rating disabilities in current use 'by the Veterans Administration”, and this requirement is also couched in mandatory terms.
The distinction between the terms “disabling” and “contributory” as they are used in paragraph 17 a of AFM 35-4 is plain. A disabling defect is one which renders the member unfit to perform military duty. A contributory defect *208 is one which is not disabling but which is, nevertheless, ratable under the VA Schedule, since it detracts from the “whole man” concept which is central to determinations under the VA Schedule. A contributory defect may not only interfere with the individual’s ability to earn a living in civilian life, but may also affect his military performance although not enough to be disabling in itself. Thus a member who has no one defect which by itself disables him from military performance, may nevertheless be disabled from such performance by an accumulation of contributory defects of a ratable quality, and paragraph 17 o of AFM 35-4 requires that the service will find a percentage of disability as to each such contributory defect.[2] To be of ratable quality the defect need not affect military performance per se, since the VA Schedule of ratings is directed to capacity for civilian performance. The rating given a particular condition by the military service for retirement purposes may be zero unless the VA Schedule mandates a minimum rating, in which case the rating must be no less than the minimum {infra). All conditions ratable in the VA Schedule are deemed to contribute to unfitness, even where the rating is zero. Mross v. United States, 186 Ct. Cl. 165, 169 (1968).
In the present instance the dispute centers on the fact that, whereas the Veterans Administration in 1958 announced for plaintiff a combined disability rating of 50 percent as of the end of 1957 (up from 40 percent as of September 1953 when plaintiff was separated), later in 1958 the Correction Board found a disability rating of 20 percent at the time of separation, omitting any rating for plaintiff’s shoulder scar with *209 retained foreign body, a defect which the Veterans Administration had rated at 10 percent. Had the Correction Board rated this disability at 10 percent, as plaintiff contends it was required to do, he would have been entitled to a combined rating of 30 percent instead of 20 percent, and thus to disability retirement pay instead of severance pay under the Career Compensation Act of 1949. The Board found that “The scars and other mentioned defects [including by necessity the scar and retained foreign body in the right shoulder] obviously are not contributory to unfitness although they may be ratable under schedule.” Cf. Lawler v. United States, 169 Ct. Cl. 644 (1965), finding 27.
The defendant contends that the Board was not required to rate plaintiff’s shoulder condition because the scars were well-healed, non-symptomatic (WIENS), whereas VA Diagnostic Code 7804 under which the VA made a rating by analogy[3] of 10 percent relates to “Scars, superficial, tender and painful on objective demonstration.” Findings 5(d), 10,11(a), 11(b), 12,13(f) and 14(b) made by the previous trial commissioner, lend collective support to the VA finding of 10 percent disability under Code 7804, for while the right shoulder scar may not have been “tender or painful on objective demonstration” at the time plaintiff was examined by Dr. Genner just before trial (finding 17), there were both subjective and objective evidence and findings before the Board that it was the cause of complaints by plaintiff of pain and fatigue at various times since its inception, that it caused a residual weakness after continuous use of the arm, and even a finding at one examination that the right shoulder was “paralyzed on and off” and tired easily, although shoulder motions were normal. One of the reasons given by the Air Force in December 1957 for finding the plaintiff “medically disqualified for military service” was residual weakness with occasional pain of the right Shoulder and left lower limb”, so it is difficult to reconcile the Board’s rationaliza *210 tion that the plaintiff’s shoulder condition, together with certain other scars, were “obviously * * * not contributory to unfitness although they may be ratable under the schedule.”
Since the Air Force was under the same obligation as the YA to resolve reasonable doubts of degree of disability in favor of the claimant,[4] it is reasonable to construe the Board’s conclusion that the shoulder condition may have been ratable as amounting to a requirement that it should therefore have been rated, even though it may have contributed nothing to plaintiff’s unfitness in the Board’s judgment. Paragraph 3-54 of AFM 36-4 (June 4, 1970) authorizes a zero rating for listed conditions under the YA Schedule which are so mild that they do not cause or contribute to unfitness for military service, except where the VA Diagnostic Code specifies a minimum rating which exceeds zero. There are two things wrong with this hypothesis, however. In the first place, the Board erroneously assumed that the criteria for plaintiff’s fitness to be fitness for military service so far as the rating requirement was concerned, whereas the entire scheme of the YA Schedule which is the bible for ratings is devoted to fitness for civilian livelihood, and a physical defect should be ratable — and therefore rated — whether it contributed to military or civilian unfitness under the “whole man” concept. Also, the zero rating authorization in AFM 35-4 was promulgated in June 1970, long after the 1953 date of separation controlling this case, and no suggestion has been advanced that the zero rating authorization had earlier sanction. It may well be that military service requires a higher degree of physical fitness than civilian employment, so that a condition deemed not to contribute to unfitness for the one would contribute even less to the other. But this is mere speculation and has not been discerned as a principle or policy in the applicable regulations. One can conceive, furthermore, of many civilian employments that are demonstrably more arduous and taxing than many military assignments, such as professional athletes who are often *211 deemed physically unacceptable for military servitude despite their remarkable cavorting on the field. At any rate, a disability or defect need not be unfitting for military service to be ratable under the VA Schedule, and it would be startling to believe that the shoulder impairment which was cited as one of two defects prompting the Air Force to declare plaintiff medically disqualified for military service in 1957 could be held by the Board in 1958 to be not worth a rating under the VA Schedule.
The Board’s failure to rate the plaintiff’s shoulder disability is rendered more inexplicable by the language of the VA Schedule, quoted in finding 19, that “deep penetrating wounds of relatively short track by * * * shrapnel fragment are to be considered as of at least moderate degree”, even in the absence of debridement medicales® for surgical removal of lacerated, macerated, or contaminated tissue. Webster’s Unabridged, 2d ed.) or of prolonged infection, provided there is a record of complaints of fatigue and pain after moderate use. The compliance of plaintiff’s shoulder condition with this description is inescapable, despite the conflicting testimony of Dr. Genner recited in finding 17, which incidentally was not before the Board but was elicited at the subsequent court trial.
Thus we have a combat wound in plaintiff’s right shoulder which the VA Schedule directs be rated as of an “at least moderate degree” of disability, and have left only the task of allocating the condition by permitted analogy to the diagnostic code number most closely related to its description, since no diagnostic code classification is precisely in point. The VA felt the closest analogy to be Diagnostic Code No. 7804 which is one of a series of conditions under the general heading of skin ailments. Dr. Pettibone, who testified for plaintiff at the trial here (finding 16(b)), and who spent many years as a professional official of the Veterans Administration in adjudicating claims for physical disability under the VA Schedule, felt that plaintiff’s shoulder condition should have been rated under either Diagnostic Code Number 5304 or 5305, pertaining respectively to injuries to the intrinsic muscles of the shoulder girdle or to the flexor muscles *212 of the elbow. Whether the plaintiff’s shoulder condition was more closely analogous to Diagnostic Code Number 7804, 5804, or 5305 happens to be immaterial, for in each instance the disability rating is fixed at 10 percent for a moderate degree of disability.[5]
The court could, of course, permit the parties to return to the Board to obtain a specific rating for the shoulder injury which it had in error failed to rate. Conceivably if that were done the Board might arrive at a zero rating, for the court’s criticism of the Board’s performance is only in its failure to apply a rating of any kind. If the issue were so remanded to the Board for determination, then in the normal course of events a ruling by the Board that did not meet with plaintiff’s approval would in all probability revisit the court for review. However, in the pending case of Haber v. United States, Ct. Cl. No. 268-66, the court on December 3, 1971, returned the case to the trial commissioner to adjudicate a disability issue, instead of following the earlier recommendation of the trial commissioner for a stay of judicial proceedings pending redetermination by the Board in the light of evidence adduced in the court trial. As a practical matter from the standpoint of dispatch, the court’s policy in the Haber case is a wholesome recognition of the shortness of life, the natural preference to reward a deserving suitor rather than eventually his estate, and the need to find the shortest distance between wrong and redress. The courts are strewn with Pyrrhic survivors of procedural masterworks.
In short, the Board’s decision is not to be reversed because it lacked substantial evidence, but on the legal grounds of a procedural omission which unjustly deprives plaintiff of his desserts.
EINDINGS OF FACT
The court, having considered the evidence, the reports of Trial Commissioners Richard Arens and C. Murray Bern *213 hardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) Plaintiff, who was born on February 24, 1920, is a citizen of the United States and a resident of the State of New York.
(b) On December 4, 1942, he enlisted in the Enlisted Reserve Corps of the United States Army Air Corps.
(c) On February 24,1943, he was called to active duty.
(d) On April 14, 1944, he was honorably discharged to accept a commission.
(e) On April 15,1944, he accepted appointment as Second Lieutenant, Army of the United States.
(f) On October 3, 1945, he was promoted to First Lieutenant, Army of the United States.
(g) On June 23, 1947, he accepted appointment as Captain, Air Reserve.
(h) On February 15, 1951, he was promoted to Captain, Air Force of the United States.
(i) On November 13, 1952, he accepted appointment as Captain, Air Force Reserve (Indefinite Term).
(j) On September 16, 1953, he was relieved from active duty by reason of a reduction-in-force program, but not by reason of physical disability.
(k) From May 2, 1955 to May 16, 1955; from May 14, 1956 to May 28, 1956; and from May 13, 1957 to May 27, 1957, he served on active duty training.
(l) Effective December 31, 1957, he was assigned to the Retired Reserve Section and placed on the United States Air Force Reserve Retired List, by reason of having been found medically disqualified for active duty as a result of a service connected disability.
2. (a) On November 14, 1958, the Assistant Secretary of the Air Force, based upon action of the Air Force Board for the Correction of Military Records, directed that plaintiff’s records be corrected to show that he was discharged on September 16, 1953, by reason of physical disability, with entitlement to severance pay benefits, that he was on September 16, 1953, unfit by reason of physical disability incurred *214 while in active Federal service, that his disability was permanent, and that the rating of his disability was 20 percent.
(b)In this suit plaintiff alleges that the foregoing rating of his disability at 20 per cent was arbitrary and capricious, that his disability should have been rated at a minimum of 50 percent, and that he is accordingly entitled to disability retirement pay instead of severance pay under the Career Compensation Act of 1949,[1] for which he seeks judgment.
3. (a) On November 26, 1944, while plaintiff was on a combat mission over Germany, the plane in which he was serving as co-pilot exploded after being hit by enemy flak. Plaintiff sustained multiple wounds and, after parachuting into enemy territory, he was taken a prisoner of war.
(b) Between November 1944 and April 1945, while a prisoner of war, he underwent at least four operations in German hospitals for the removal of flak and secondary closure.
4. (a) On April 2, 1945, plaintiff was released from his prisoner of war status and returned to military control.
(b) On April 8,1945, he was received at the United States 100th Evacuation Hospital.
(c) On April 10, 1945, he was transferred to the 186th (US) General Hospital where a large foreign body was removed from the soft tissue, postero-medial, above the left knee joint.
(d) An April 18, 1945, he appeared before a Disposition Board which found that he was unfit for further duty in the European Theatre of Operations because of the following which occurred in line of duty:
1. WIA, wound, perforating, thigh, left, mid third, entrance lateral surface, exit posterior surface, with injury to peroneal nerve, flak, 1200 hours, 26 November 1944, Germany.
2. Malnutrition, moderately severe, caused by insufficient nourishment while POW of Germans from 26 November 1944 to 2 April 1945.
* * * * *
*215 The Board recommended that he be transferred to the Zone of Interior for further hospitalization and treatment, and that he be placed in neurosurgery.
(e) On May I, 1945, he was admitted to the Thomas M. England General Hospital, Atlantic City, New Jersey, after having been previously evacuated to the Regional Hospital, Mitchell Fi'eld, New York. The clinical abstract contained the following:
COURSE IN HOSPITAL: He was seen by the Neuro-Surgical Consultant who felt that a spontaneous recovery of the left peroneal nerve was taking place and suggested a foot brace and convalescent leave. On return from leave re-examination revealed a normal return of function of the left peroneal nerve and he was given clearance for return to duty.
DIAGNOSIS: Paralysis of nerve, left common per-oneal, incomplete, secondary to flak wound of left leg received on an operational mission over Germany, 26 November 1944 when struck by flak. Recovered.
* * # * *
(f) On September 12, 1945, a Disposition Board which convened at Thomas M. England General Hospital, Atlantic City, New Jersey, made the following diagnosis:
Paralysis of nerve, left common peroneal, incomplete, secondary to flak wound of left leg received on an operational mission over Germany, 26 November 1944 when Struck by flak. Recovered. Line of duty: Yes.
The Board recommended that he be returned to general military service.
(g) On September 18,1945, he was released from the hospital and returned to duty and flying status.
5. (a) On March 24, 1950, plaintiff was admitted to Brooke General Hospital, Fort Sam Houston, Texas, by transfer from the Station Hospital, Tinker Air Force Base, Oklahoma, with a transfer diagnosis of neuropathy, left peroneal nerve, due to “old” battle injury. The clinical record reads:
*216 History reveals that patient Was struck, by shrapnel, left thigh and lateral border of left knee, in 1944 while on a training flight over Germany. Patient was taken prisoner by the Germans and treated in a German Hospital and flak removed. Following this he had a left foot drop for several weeks and severe pain in the left lateral leg for several months. He was returned to duty and has had impaired sensation to sharp pain in the left lateral leg, and occasional muscle cramp in the left lower posterior thigh. Physical examination on admission was essentially negative except for slight limitation of degree of dorsiflexion of left foot. Neurological — Dull to pin Erick over lateral leg, left, and dorsum of left foot, cars — head of left fibula and on left thigh and right leg.
Consultations by neurosurgery, vascular department and anesthesia gave clearance. Orthopedic consultation suggested that patient have hamstring stretching under anesthesia and be returned to duty. On 9 May 1950 patient was taken to the operating room and under general anesthesia the hamstring group of the left lower extremity was stretched forcibly into full flexion with the lower extremity by-passing the 90 degrees of normal range of motion. Convalescence was uneventful and it is felt at this time that patient may be returned to duty.
Diagnosis: Spasm, hamstring group of muscles, left lower extremity, secondary to wound, sustained in battle 1944 in Germany. Improved. LOD: Yes.
(b)On May 28, 1950, he was discharged and returned to duty.
(c)On June 27, 1950, he was readmitted to Brooke General Hospital, Fort Sam Houston, Texas, where his chief complaint was “charley-horse” in his left leg, pain and weakness.
(d)On August 2, 1950, he appeared before a Medical Board at Brooke General Hospital where a diagnosis was made as follows:
1. Cicatrices of skin, multiple, due to trauma, posterior and lateral aspects of left thigh, lateral aspect of left knee, posterior aspect of right lower leg, posterior aspect of right shoulder, secondary to flak wounds re *217 ceived wlien patient was shot down over Germany in combat on 26 Nov 1944.
Condition on discharge: Unchanged. LOD: Yes.
The Medical Board recommended that he appear before the Air Force Physical Evaluation Board.
The clinical abstract, attached to the proceedings of the Medical Board, reflects the following pertaining to the physical examination:
Physical Examination at .this time reveals a scar on the posterior aspect of the left thigh which is adherent, slightly tender, and is approximately 4 inches long and 1 inch'wide. On the lateral aspect of the left thigh m the middle third there is a nontender, nonadherent, circular scar approximately 1 inch in diameter. There is a tender, slightly adherent scar over the head of the fibula on the lateral aspect of the left knee approximately 1% inches long and y2 inch wide. On the posterior aspect of the right lower leg there is a nontender, slightly adherent scar approximately 2y2 inches long and y2 inch wide. Range of motion in the joints, both lower extremities, is normal, strength is good, and reflexes are normal. There is also on the posterior aspect of the right shoulder a small nontender nonadherent scar approximately y2 inch in diameter. The rest of the physical examination is normal.
Laboratory Examinations: Routine blood, serology and urinalysis, within normal limits.
(e) On August 16, 1950, accompanied by counsel, he appeared before an Air Force Physical Evaluation Board at Brooke Army Hospital. His medical records were received in evidence and he testified that he did not wish to remain on active duty; that after standing for some two hours, i.e., playing nine holes of golf, he suffered pain in the thigh and a “charley-horse” which persisted for about a half-hour. He stated that since he returned to duty from the Thomas M. England General Hospital, Atlantic City, New Jersey, in November 1945, he did comparatively little flying as a pilot; that he received a “charley-horse” on two flights, but was still on flying status.
*218 The Physical Evaluation Board, on that date, found him physically fit for duty and made a diagnosis as follows:
Cicatrices of skin, multiple, due to trauma, posterior and lateral aspects of left thigh, lateral aspect of left knee, posterior aspect of right lower leg, posterior aspect of right shoulder.
The Board recommended that under Veterans Administration Code 7804 the disability rating be zero.
(f) On August 28, 1950, he submitted to the Physical Review Board a rebuttal in which he stated, among other things, that he could not perform duty unless the pain and cramping in his left leg disappeared; that he was required to wear a pair of stiff paratroop boots at all times to aid in strengthening his foot; that the peroneal nerve was still paralyzed as indicated by the fact that he could touch his leg with a burning cigarette and not feel pain; that he was of the opinion that he could perform only limited duty involving little or no walking; and that he felt that in the best interest of the Service and of himself, he should be separated.
(g) On October 12, 1950, the Secretary of the Air Force approved the recommendations of the Physical Review Board with regard to the findings of the Air Force Physical Evaluation Board, that he was physically fit to perform the duties of his office, rank, grade, or rating.
(h) On December 20,1950, he departed for overseas service in Newfoundland.
6. On September 4, 1951, the Commanding Officer of the Ernest Harmon Air Force Base, Newfoundland, requested the Headquarters, Department of the Air Force, to review his personnel and medical records to determine whether or not he was physically qualified for flying. The Commanding Officer noted that plaintiff stated that he was not physically qualified for flying duty, but that certain of his records and field file did not reveal any substantiating record of physical disqualifications for flying duty.
7. (a) On March 25, 1952, Headquarters, Department of the Air Force, advised the Commanding Officer of the Ernest *219 Harmon Air Force Base that plaintiff’s automatic suspension from flying status as of March 24, 1950, had been recorded; that a review of Ms medical records on file at Headquarters revealed no absolute medical reason to continue his suspension from flying; and that it was recommended that he be given a medical examination for flying, and that a report of the results be forwarded to the Headquarters for review.
(b) On April 17, 1952, he underwent a medical examination for flying at Ernest Harmon Air Force Base. The report of the examination, under the heading, “Summary of Defects and Diagnoses” reads:
41. Injury, left peroneal nerve, resulting in an area of decreased sensation to pin prick and light touch over dorsum of left foot, extending up anterior lateral surface of left leg to just below knee.
50. Metallic foreign body (flak), posterior portion of left mid-thigh.
The report stated that he was qualified for flying duty, Class II, and concluded that since August 16, 1950, when the Air Force Physical Evaluation Board had found Mm fit for duty:
* * * the officer has had no complaints referrable to his left leg except an area of diminished sensation over the lateral aspect of the left lower leg and dorsum of the left foot. This has been present since the original injury, and there has been no essential change since his last hospitalization. After walking five to six miles, he does feel weaker in the left leg as compared to the right.
(c) On July 29, 1952, the Surgeon General, United States Air Force, certified on the foregoing report of the examination, “Physically Qualified Flying Duty,” with a waiver for “hypoesthesia, left foot.”
(d) On September 26, 1952, he underwent another medical examination for flying at Ernest Harmon Air Force Base. The report of the examination stated that he was qualified for flying duty, Class II.
(e) On September 29, 1952, he appeared without counsel before a Flying Evaluation Board at Ernest Harmon Air *220 Force Base, which was convened to make findings and recommendations concerning bis rated status. His medical and other records were received in evidence and he testified that he desired flying duty; that his leg bothered him when he walked as much as a mile; and that he did not believe that his leg would allow him to fly a mission of 16 to 18 hours without giving him problems.
The Board’s findings were:
The board after having carefully considered the evidence presented finds that Captain Bieth is physically and mentally qualified for flying duty. It was also found during the proceedings of the board that from the time Captain Bieth reported, to Tinker AFB, Oaldahoma City, Oaldahoma [sic] in February of 1950, administratively his entire case has been handled with gross negligence. No orders or records could be found in order that some degree of continuity could be established. Various headquarters published orders, on Captain Bieth, some of which showed him as being on flying status without any apparent justification to establish this status.
The Board recommended that he be returned to full flying duty and that the suspension be revoked.
(f) On October 14,1952, the Commander of Ernest Harmon Air Force Base signed a document stating that he had not concurred in the findings and recommendations of the Flying Evaluation Board because the Board failed to recognize plaintiff’s mental condition as evidenced by his lack of incentive for flying and his exhibition of only a mild interest in returning to flying status; that his value to the Air Force as a pilot was below standard; and that he was surplus to the needs of the Base.
(g) On November 22, 1952, the Surgeon General, United States Air Force, certified on the report of the medical examination of September 26, 1952 (finding 1 (d), supra), that he was physically qualified for flying duty.
(h) On November 30, 1952, he returned to the United States from Newfoundland.
*221 (i) On December 2, 1952, the Department of the Air Force rescinded his suspension from flying status.
8. (a) On September 7,1953, plaintiff underwent a physical examination for, discharge at an Air Force Dispensary, Memphis, Tennessee. The report of the medical examination noted the small scar behind his left shoulder j moderate atrophy of the left gastrocnemius; the 3 inch scar posterior aspect of the left thigh; 2 scars over gastrocnemius muscle at leg; the 1 inch scar lateral aspect left thigh; the 2 inch scar laterally and just below the left knee; weakness of dorsal flexion of the ankle and extension of the left knee; a 25 percent limitation of flexion of the left hip; and atrophy and moderate weakness of the left leg due to an old peroneal nerve injury. The report further noted that he was qualified for separation.
(b) On September 16,1953, as heretofore indicated, having-attained the rank of Captain, he was relieved from active duty as the result of a reduction-in-force program, but not by reason of physical disability. He reverted to inactive status but continued as a member of the Active Beserve of the United States Air Force.
9. On December 1, 1953, plaintiff filed a claim for compensation with the Veterans Administration.
10. On July 20, 1954, plaintiff was examined by the Veterans Administration at the Veterans Administration Be-gional Office, New York City. His chief complaints were pain in the right shoulder, pain in the left thigh, and pain and weakness in the left lower extremity. The scars were noted and neurological examination resulted in a diagnosis of paralysis, mild, common peroneal nerve, left.
11. (a) On January 10,1955, the Veterans Administration rated plaintiff as of September 17, 1953. The rating sheet revealed that at issue were “service connection for shrapnel wounds of left leg, left thigh, right shoulder, right arm and stomach disability.” The facts were recorded as follows:
The service clinical records reveal veteran received slight wounds left thigh, left knee, right lower leg right, *222 shoulder when he was shot down over Germany in combat on 11-26-44. He was a prisoner of war of the Germans from 11-26-44 to 4-2-45. During this period he suffered from malnutrition caused by insufficient nourishment. The service records also show paralysis of common peroneal nerve, left, incomplete. Cited examination report reveals adherence scar, left thigh with loss of muscle substence [sic]. Also adherence scar left leg. The report also shows scars left hip, left knee and ankle, shoulder and right arm. These scars are nonsymp-tomatic. A diagnosis of paralysis, mild, common peron-eal nerve, left is shown.
The rating, 'under YA Diagnostic Code 5301 was 20% for scars, SFW, left thigh; under VA Diagnostic Code 5311 was 10% for scars, SFW, left leg; under YA Diagnostic Code 7804 was 10% for scars, left hip, left knee, ankle, right shoulder and arm; and under VA Diagnostic Code 8521 was 10% for paralysis, mild, common peroneal nerve. The combined rating was 50% from September 17, 1953.
(b) On May 4, 1955, in connection with a tour of active duty in the United States Air Force Reserve from May 2, 1955 to May 16, 1955 (finding 1(k), supra), he underwent a physical examination at the United States Army Dispensary, Schenectady, New York. The clinical evaluation revealed that there was some lack of strength in his left leg and that he had scars on his right shoulder and arm, left thigh, left leg and right leg. The notes in the report of the examination read:
Usual childhood diseases.
40% YA Disability for wound’s, arms, and legs; as they tire easily during continous [sic] duties or long walking. Recommended for Active Duty with waiver, as active duty consists of office routine; field duty should be limited.
Muscular, well developed.
Some lack of strength in left leg. — 20% disability for partial loss of motion.
The summary of defects and diagnoses reads: “Residual weakness after continous [sic] duties of arms and legs.” He was found qualified for general service with waiver.
*223 12. On May 15, 1956, in connection with, a tour of active duty from May 14, 1956 to May 28, 1956 (finding l(k), supra), plaintiff again underwent a physical examination, United States Army Dispensary, Schenectady, New York. The clinical evaluation in the report of the examination reads:
#35 Right shoulder paralized on and off due to War injury (still a foreign body in that area). Motions normal, but arm-shoulder area tiring easily.
#37 Left lower limb tires easily after war injury. Calf circumference is %" less than on right side. There is a residual slight weakness of the left peroneal nerve.
Some loss of strength in lower leg. Scars right shoulder, arm and left thigh. Right and lower leg.
The notes in the report of the examination read:
Usual childhood diseases.
40% YA disability for wounds, arms and legs tire easily.
Some loss of strength in leg, 20% disability for loss of motion, partial peroneal weakness.
Muscular and well developed.
Recommended for active duty with waiver as active duty in office work.
Field duty to be restricted.
The summary of defects and diagnoses reads: “* * * Residual weakness with occasional pain of right shoulder and left lower limb (peroneal nerve, slight weakness).” He was found qualified for general service with waiver.
13. (a) On May 14, 1957, in connection with a tour of active duty with the United States Air Force from May 13, 1957 to May 27, 1957 (finding 1 (k), supra), he again underwent a physical examination at the United States Army Dispensary, Schenectady, New York. The report of the examination reflected the following summary of pertinent data:
Usual childhood diseases.
40% YA disability for wounds, arms and legs tire easily.
*224 Some loss of strength in leg, 20% disability for loss of motion, partial peroneal weakness, Muscular and well developed.
Eecommended for active duty with waiver as active duty in office work.
Field duty to be restricted.
(h) On June 24,1957, Headquarters, Air University, Maxwell Ain Force Base, Alabama, stamped on the foregoing report that he was disqualified for general service.
(c) On July 10, 1957, Headquarters, Air Eeserve Eecords Center, United States Air Force, found him disqualified for general service.
(d) On July 25, 1957, the Commander of the Air Eeserve Seconds Center, United States Air Force, advised him that the records indicated that he was medically disqualified for general military service; that he was eligible for transfer to the Eetired Eeserve Section; but that since such transfer could be made only at his request, a form was enclosed for his application for the transfer.
(e) On November 8,1957, he filed an application with the Air Force Board for the Correction of Military Eecords, in which he requested that his name be placed on the disability retired list as of the date of his separation from active duty, with entitlement to disability retirement pay from such date, or, alternatively, if required, that his case be submitted to a Disability Eetirement Eating Board for evaluation of the percentage of his disability at the date of Ms separation. He further stated in his application that as a result of a permanent injury incurred in line of duty in time of war, he was on the date of his separation from active duty in September 1953, physically disabled from performing active duty in the Air Force; that his disability was then 40 percent under the standard rating schedule used by the Veterans Administration ; that although the Air Force knew of his disability, he was not advised of his right to have his case passed on by a Eetirement Disability Eating Board, and consequently his case was not so presented to such a Board; and that if his *225 case bad then been, so presented, such Board would have determined his disability at 40 percent under the standard schedule then in effect.
(f) On December 3, 1957, the Commander of the Air Be-serve Becords Center, United States Air; Force, advised him that he could not remain in an active status in the Air Force Beserve, since he had been determined medically disqualified for military service due to residual weakness with occasional pain of the right shoulder and left lower limb; and that his application for transfer to the Betired Beserve Section had been processed to Headquarters, United States Air Force, Washington, D.C.
(g) On December 30,1957, he was given a medical examination by the Veterans Administration.
14. (a) On January 3, 1958, the Department of the Air Force, issued Beserve Orders No. 2, by which he was relieved from assignment to the Headquarters Continental Air Command (Non-affiliated Beserve Section), Air Beserve Becords Center, Denver, Colorado; assigned to the Betired Beserve Section; and placed on the United States Air Force Beserve Betired List, effective December 31,1957, by reason of having been found medically disqualified for active duty as a result of a service connected disability.
(b) On February 25, 1958, the Veterans Administration, based upon an examination of December 30, 1957, amended its rating of January 10, 1955 (finding 11(a), supra). The rating sheet noted:
Neurological examination discloses in part, mild wasting of musculature, left; no gross foot drop with motility ankle and toes slightly impaired; plantar sensation of left foot normal; minimal sensory impairment; station and gait grossly normal; compatible [sic] complaints of pain elicited. Muscles involved identified as biceps femoris, left and gastrocnemios [sic], right; no impaired motions. X-ray right shoulder shows foreign body about 1%" in length, the region of the glenoid fossa. Old scars as noted clinically recorded as non-tender.
*226 The new rating, under VA Diagnostic Code 8521 was 20% for paralysis, incomplete, common peroneal nerve, left, moderate; under VA Diagnostic Code 5313 was 10% for wound MG XIII, left, moderate; under VA Diagnostic Code 5311 was 10% for wound MG XI, moderate, right; under VA Diagnostic Code 7804 was 10% for scar, right shoulder, with retained foreign body; under VA Diagnostic Code 1899 was 0% for scars, left lower and right upper extremity. A bilateral factor of 3.5 was added. The new combined rating was 50% from December 30, 1957.
(c) On September 17, 1958, accompanied by counsel, he testified as the sole witness in his case, before the Air Force Board for the Correction of Military Records. The Board considered the transcript of the testimony, his request for corrective action, an examiner’s brief, his master personnel records and the VA medical records. The findings and recommendations of the Board were as follows:
THE BOARD FINDS THAT:
1. The applicant has exhausted all remedies provided by law or regulation.
2. Air Force records show that applicant was commissioned second lieutenant, pilot, on 15 April 1944.
3. On his third combat mission applicant was shot down over Germany and taken prisoner of war. During this action he suffered flak wounds of the right shoulder, right arm, left leg, and left thigh. He was treated by German physicians and some of the flak was removed.
4. Applicant returned to Allied control on 2 April 1945 and placed in medical channels. On 18 April 1945, a disposition board recommended return to the ZI for further treatment. After processing, a disposition board on 12 September 1945, made a diagnosis of Paralysis of nerve, left common peroneal, secondary to flak wound (left leg) and found applicant fit for full military duty. Applicant returned to duty on 18 September 1945, and resumed flying status.
5. In eax’ly 1950 applicant complained of some difficulty in flexion of the left foot. He was hospitalized on 24 March 1950, and at this time was suspended from *227 flying status. He was thought to have a spasm of the hamstring muscles of the left leg and these were forcibly stretched. On 2 August 1950 a Medical Board recommended appearance 'before a Physical Evaluation Board because of the multiple cicatrices resulting from the flak wounds. On 16 August 1950, a Physical Evaluation Board found applicant fit for duty. This finding was approved.
6. In December 1950 applicant was transferred to Iceland for duty. In September 1951 action was initiated to determine applicant’s qualification for flying.. He was found physically qualified Glass II with waiver for hypothesia, [sic] left foot. Applicant later met a Plying Evaluation Board and was found qualified for flying duty. On 2 December 1952 the previous suspension from flying duty was removed.
7. Applicant returned to the ZI in November 1952. On 7 September 1953, he was examined for the purpose of separation and the medical report notes the small scar behind the left shoulder, with moderate atrophy of the left gastrocnemius; the 3 inch scar on the posterior aspect of the left thigh; the two scars over the gastrocnemius muscle at the leg; the 1 inch scar lateral aspect left thigh; the 2 inch scar laterally and just below the left knee; weakness of dorsal flexion of ankle and extension of left knee; limitation of flexion of left hip — 25%; and atrophy and moderate weakness of the left leg due to old peroneal nerve injury. Applicant was considered physically qualified for separation.
8. On 16 September 1953 applicant was relieved from active duty in the grade of Captain, under the reduction in force program. On 31 December 1957, he was assigned to the Retired Reserve Section by reason of physical disqualification for retention in the active reserve.
9. On 1 December 1953, applicant filed a claim for compensation with the Veterans Administration. He was examined by that Agency on 20 July 1951, at the Veterans Administration Regional Office, New York City, and chief complaints were pain in right shoulder, pain in left thigh, and pain and weakness in left lower extremity. The scars were noted and a Neurological examination resulted in a diagnosis of *228 Paralysis, mild, common peroneal nerve, left. By rating action dated 10 January 1955 applicant was awarded a 20% rating for soars, SFW, left thigh; 10% for scars SFW, left leg; 10% for scars, left hip, left knee, ankle, right shoulder and arm; and 10% for Paralysis, mild, common peroneal nerve; combined rating 40%.
10. Applicant was re-examined by the Veterans Administration on 30 December 1957. The Eating Sheet reports that “Neurological examination discloses in part, mild wasting of musculature, left; no gross foot drop with motility ankle and toes slightly impaired; plantar sensation of left foot normal; minimal sensory impairment; station and gait grossly normal; compatible [sic] complaints of pain elicited. Muscles involved identified as biceps femoris, left and gastrocnemios [sic], right; no impaired motions. X-ray right shoulder shows foreign body about D/4" in length, the region of the glenoid fossa. Old scars as noted clinically recorded as non-tender.”
11. On 25 February 1958 applicant’s case was rated as follows from 30 December 1957:
20% paralysis, incomplete, common peroneal nerve, left, moderate.
10% Wound, MG XIII, left, moderate.
10% Wound, MG XI, moderate, right.
10% Scar, right shoulder, with retained foreign body.
0% Scars, left lower extremity.
0% Scars, right upper extremity.
Combined rating 50% from 30 December 1957.
12. A report from the Surgeon General states in pertinent part that, “It is felt that at the time [of] termination of his active service he was entitled to consideration of his defects by a Physical Evaluation Board. It is the opinion of the Surgeon General that such consideration would properly have resulted in a final determination of physical unfitness for general military service by reason of paralysis, external popliteal nerve, left, mild, Veterans Administration Code No. 8521, ratable at 10%, and muscle injury, Group XIII, left, moderate, Veterans Code No. 5313, ratable at 10%, with combined rating of 20%; that *229 the other defects did not contribute to the unfitness and were not ratable, that the disability is permanent, that it was incurred while entitled to receive basic pay, and that misconduct was not involved”.
13. Careful consideration has been given to the application, the testimony of the applicant and the argument of counsel, and to the evidence of record. The evidence shows that despite certain physical limitations applicant was able to perform duty satisfactorily, including flying duty. He also performed very effectively in the Reserve after release from active duty. However, we agree that by virtue of the physical defects he was entitled to a Physical Evaluation Board prior to separation and applying strict standards he probably would have been found unfit by reason of the left leg condition. As the record shows the left leg disability was related to the hamstring muscles (Muscle Group XIII) and the mild paralysis of the left common peroneal nerve. The scars and other mentioned defects obviously are not contributory to unfitness although they may be ratable under schedule. In our view the evidence shows that applicant was unfit and the left leg disabilities were ratable at 10% for the muscle damage MG XIII and 10% for the paralysis, mild, left common peroneal nerve. The records should be corrected to show that applicant was discharged with severance pay.
THE BOARD RECOMMENDS THAT:
1. The pertinent records of the Air Force Establishment relating to BERNARD G. RIETH, AO 827 966, be corrected to show that he was discharged from the United States Air Force on 16 September 1953, by reason of physical disability with entitlement to severance pay benefits.
2. The pertinent records of the Air Force Establishment, relating to BERNARD G. RIETH, AO 827 966, be further corrected to show:
a. That on 16 September 1953, he was unfit to perform the duties of his office, rank, grade or rating by reason of physical disability incurred while in active Federal service.
b. That the diagnoses in his case are Paralysis, external popliteal nerve, left, mild, Code No. 8521 — *230 10%; and, Muscle injury, Group XIII, left, moderate, Code No. 5313 —10%.
c. That in accordance with the standard schedule for rating disabilities in current use by the Veterans Administration, the rating of his disability is twenty (20) per centum.
d. That the disability is permanent.
e. That the date he became unfit to perform the duties of his office, rank, grade or rating was 16 September 1953.
f. That the disability is not due to intentional misconduct or willful neglect.
g. That the disability was not incurred during a period of unauthorized absence.
h. That the disability was incurred in combat with an enemy of the United States, and it was caused by an instrumentality of war in line of duty.
d. That the disability was the proximate result of the performance of active duty within the meaning of Title IV, Public Law 351,81st Congress.
3. All necessary and appropriate action be taken in consonance with these recommendations.
(d) On November 14,1958, the Assistant Secretary of the Air Force approved the above recommendations of the Air Force Board for the Correction of Military Records.
(e) On November 21, 1958, the Executive Secretary of the Air Force Board for the Correction of Military Records advised him of the Board’s decision and of a directive, signed by the Assistant Secretary of the Air Force implementing the decision.
(f) On December 12, 1958, the Assistant Chief of the Air Force Disability Separations Branch, Promotions and Separations Division, advised the Air Force Accounting and Finance Center that the Secretary of the Air Force had determined that plaintiff was eligible to receive disability severance pay under the provisions of 10 U.S.C. § 1212.
15. On February 20, 1959 and on March 12, 1959, the Air Force Accounting and Finance Section forwarded to plaintiff for his signature claim certificates which showed that he was due $9,455.16 severance pay, less payments of VA com *231 pensation of $5,181.15, or. $4,272.01. He did not return the claim certificates for payment.
16. (a) At the trial in this court, plaintiff reiterated the essence of his statements appearing in the medical records, exhibited Ms wounds and demonstrated the limitation of certain leg and foot motions. He also offered the testimony of Dr. Michael Menza, a specialist in traumatic surgery hi the Veterans Administration, who had examined plaintiff and had studied certain X-rays of plaintiff. He testified (insofar as pertinent to the issues herein) that plaintiff had a retained metallic foreign body (about the size of a 22 caliber bullet) in the soft tissue between tissue muscles in his right upper arm, and that the scars revealed that this was a “through and through” wound; that the wound in Ms left thigh, marked by a deeply depressed scar which adhered to the underlying structure, was also a “through and through” wound, and caused damage to the sciatic (motor) nerve which innervates the foot, and to the hamstring muscles; that he had two scars behind the outside portion of his right knee joint, one of wMch was adherent, tender and depressed and one of wMch was completely healed; and that there was a “certain amount” of muscle damage to the gastrocnemius muscle, being the large muscle of the right calf.
(b) Plaintiff also offered the testimony of Dr. Maurice A. Pettibone, a section chief in the Adjudication Division of the Veterans Administration Regional Office in New York City. He testified that he had been adjudicating claims for physical disability in the Veterans Administration since April 1946; that from the testimony wlfich he had heard in the case, the “through and through” wound in plaintiff’s upper right arm would be ratable under either. VA Diagnostic Code 5304 or 5305 as 10 percent; that the left knee injury, with sensory and motor nerve involvement, would be rated at not less than 10 percent; that the “through and through” wound in the left thigh with damage to the hamstring muscles would be ratable at not less than 30 percent; that the damage to plaintiff’s right knee, with a “through and through” wound and with both sensory and motor paralysis *232 involved, would be ratable at not less than 10 percent under either “the skin code or the muscle code, but not both”; and that “in combination the disabilities here could sustain a rating about which reasonable men might vary from perhaps as low as 50 to as high as 80, but not less than, in my opinion, 50 percent, under any reasonable construction of the schedule.” Dr. Pettibone emphasized that he was testifying “from a Veterans Administration standpoint.”
17. (a) Defendant offered the testimony of Dr. Byron A. Genner, III, an orthopedic surgeon and Lieutenant Colonel in the Air Force Medical 'Corps. Dr. Genner had extensive experience in treating gunshot wounds of members of the armed forces and performed an orthopedic physical examination of plaintiff about two months before the trial. Dr. Gen-ner testified that, except for scars, there was nothing in the physical examination which indicated any abnormality with plaintiff’s right or left shoulder or upper extremities; that his examination of plaintiff’s X-rays revealed clear evidence that the metallic foreign body was not within the shoulder joint or within the shoulder joint capsule, but was outside of the shoulder joint, near the neck of the scapula and not in the socket point of the ball and socket joint; that plaintiff had a full range of shoulder motion, with no muscle weakness and no loss of muscle mass or atrophy; and that there was no evidence of arthritis of the shoulder joint.
(b) Dr. Genner further testified that plaintiff demonstrated loss of skin sensation over the distribution of the common peroneal nerve, and a slight lack of dorsiflexion, amounting to a very minimal limitation of motion of approximately 5 degrees, of his left foot; that plaintiff could walk on his heels and toes of both the left and right foot; that plaintiff had a moderately severe gunshot wound of his left thigh, with a loss of some of the hamstring muscles which remain within functional range, with no injury to the sciatic nerve; that because of gunshot wound he had involvement of the peroneal nerve (at the knee level) which makes the muscles work in pulling the foot and toes up, but that the nerve had regenerated and the weakness to the muscles was minimal; and that plaintiff’s left thigh was definitely atrophied because of gunshot wound and loss of some of the *233 bulk of the muscle of the thigh, but that there was no damage to the sciatic (motor) nerve.
18. Pertinent provisions of AFM 35-4, November 1, 1952, relating to Physical Evaluation Boards are:
1. Purpose
The physical evaluation board is a fact-finding board established for the three-fold purpose of:
a. Investigating the nature, cause, degree, and probable permanency of the disability of any evaluee whose case may be brought before it.
b. Providing a full and fair hearing for the evaluee concerned if he demands it.
c. Making recommended findings on the determinations required by law to establish eligibility for disability retirement or separation. The physical evaluation board is not a statutory board and its recommended findings are subject to revision.
2. Appointment and Composition
a. Authority. Authority to appoint, constitute, and maintain permanent Air Force physical evaluation boards at locations specified by Headquarters USAF is delegated to Headquarters Command, USAF.
b. Orders. Orders appointing physical evaluation boards in every instance will cite that appointment is by direction of the Secretary of the Air Force.
c. Composition. A physical evaluation board considering the case of an evaluee will be composed of three voting members, a nonvoting recorder, and a nonvoting counsel. One and only one of the voting members will be a medical officer of the Air Force. Where practicable, one of the nonmedical voting officers should be an officer with legal training. When the evaluee is a member of a Beserve component, the majority of the voting members of the board will be Beserve officers of the Air Force, if available. In any instance where a majority of Beserve component members is not available, the board will include not less than one Beserve component officer. (This provision will not apply when the evaluee is without component.)
When the evaluee is a female, a properly appointed female commissioned officer will be substituted for a voting male member. A dental, veterinary, or Medical Service Corps officer will not sit as the medical member of the physical evaluation board.
*234 d. Selection of Members. The voting membership of physical evaluation boards will be selected from competent, mature commissioned officers of sound judgment, who are familiar with board procedures. Hospital commanders, chaplains, or Medical Service Corps officers will not be members of the board unless the shortage of other personnel so dictates. An organization commander will not sit as a member of a board to consider the case of an evaluee of his organization unless the shortage of other personnel so dictates.
e. Rank of Members:
(1) The voting membership of the board will be composed as far as may be practicable, of officers senior in rank to the evaluee being considered.
(2) The senior member of the board present will be president.
(3) The evaluee has the privilege of requiring that all voting members be his senior.
f. Assignment of Permanent Personnel:
(1) Manning responsibility for personnel assigned in a primary duty status to permanent physical evaluation boards is retained by the Director of Military Personnel, Headquarters USAF.
(2) A rated company grade officer on flying status will not be assigned in a primary duty status as a member of a physical evaluation board. Such an officer may be used as an alternate member.
(3) The normal tour of duty for the president of a physical evaluation board will be three years. The normal tour of duty for other members will be 18 months. Upon application of the member and approval by the physical evaluation board president and Headquarters USAF, the member may remain assigned for an additional tour of 18 months.
(4) The Director of Military Personnel, Headquarters USAF, ATTENTION: Promotions and Separations Division, Washington 25, D.C., will be advised 60 days in advance of expiration of tour of duty of any member.
«í»
17. Recommended Findings
a. Determination of Physical Fitness. At the close of the hearing, the board will go into closed session for the purpose of arriving at initial recommended findings on whether the evaluee is fit or unfit to perform the duties of his office, rank, or grade. The recorder and *235 counsel will not be present in tlie closed sessions. After making the initial recommended finding, the board will determine the diagnosis and severity of each physical defect noted which is considered permanent or m'ay be permanent in nature. These defects will be placed in the following categories:
(1) Disabling — Any defect which in itself rendered the evaluee unfit to perform the duties of his office, rank, or grade.
(2) Contributory — Any defect other than a disabling defect which may be classed as permanent or may be permanent in nature.
fe. Percentage of Physical Defects. Having categorized the physical defects as indicated in a(l) and (2) above, the board will determine the percentage for each physical defeat in accordance with the standard schedule of rating disabilities in current use by the Veterans’ Administration, whether the defect was due to the intentional misconduct or willful neglect of the evaluee, and whether the defect was incurred during a period of unauthorized absence of such evaluee.
c. Basis for Arriving at Findings. Since the disability of an evaluee may be comprised of one or more disabling defects; a combination of one or more disabling and contributory defects, or an accumulation of contributory defects; the determinations of the board with respect to physical defects, as outlined in a above, may be considered as preliminary steps necessary to the establishment of a basis for arriving at recommended findings with respect to the evaluee’s disability. Accordingly, having identified the physical defects which constitute the disability, including all disabling and contributory defects, the board then will proceed to make recommended findings with respect to the disability, as follows:
(1) For an evaluee who was ordered to active military service for a period in excess of 30 days and who incurred disability while so employed:
(a) Whether the disability was incurred while entitled to receive basic pay.
(b) Whether the disability is due to the intentional misconduct or willful neglect of the evaluee.
(c) Whether the disability was incurred during a period of unauthorized absence of the evaluee.
(d) The percentage of disability in accordance with the standard schedule of rating disabilities in current use by the Veterans’ Administration.
*236 (e)' Whether the disability was the proximate result of the performance of active duty.
(f) Whether the disability is permanent or may be permanent in accordance with accepted medical principles.
(g) Whether evaluee is or is not recommended for physically restricted status (see chapter 10).
(2) For evaluees other than those evaluees who were ordered to active military service for a period in excess of 30 days who incur physical disability as the result of injury sustained while performing active duty, full-time training duty, other full-time duty or inactive duty training:
(a) Whether the injury is the result of the intentional misconduct or willful neglect of the evaluee.
(b) The percentage of disability (resulting from the injury) in accordance with the standard schedule of rating disabilities in current use by the Veterans’ Administration.
(c) Whether the injury was the proximate result of the performance of active duty, full-time training duty, other full-time duty, or inactive duty training.
(d) Whether the disability (resulting from the injury) is permanent or may be permanent in accordance with accepted medical principles.
* * * * #
19. Pertinent provisions of the Veterans Administration Schedule for Eating Disabilities, 38 CFE, are:
§ 4.124a Schedule of ratings — neurological conditions and convulsive disorders.
# * * * *
DISEASES OF THE PERIPHERAL NERVES

Rating

Major Minor

The term “incomplete paralysis,” with this and other peripheral nerve injuries, indicates a degree of lost or impaired function substantially less than the type picture for complete paralysis given with each nerve, whether due to varied level of the nerve lesion or to partial regeneration. When the involvement is wholly sensory, the rating should be for the mild, or at most, the moderate degree. The ■ratings for the peripheral nerves are for unilateral involvement; when bilateral, combine with application of the bilateral factor.
*237 External popliteal nerve (common peroneal)

Rating

8521 Paralysis of
Complete; foot drop and slight droop of first phalanges of all toes, cannot dorsiflex the foot, extension (dorsal flexion) of proximal phalanges of toes lost; abduction of foot lost, adduction weakened; anesthesia covers entire dorsum of foot and toes_ 40
Incomplete
Severe_ 30
Moderate_ 20
Mild_ 10
* * *
§ 4.55 Principles of combined ratings.
# # * «1$ *
'(g) Muscle injury ratings will not be combined with, peripheral nerve paralysis ratings for the same part, unless affecting entirely different functions.
§ 4.56 Factors to be considered in the evaluation of disabilities residual to healed wounds involving muscle groups due to gunshot or other trauma.
sjc
(b) Moderate disability of muscles.
Type of injury. Through and through or deep penetrating wounds of relatively short track by single bullet or small shell or shrapnel fragment are to be considered as of at least moderate degree. Absence of explosive effect of high velocity missile and of residuals of debridement or of prolonged infection.
History and complaint. Service department record or other sufficient evidence of hospitalization in service for treatment of wound. Record in the file of consistent complaint on record from first examination forward, of one or more of the cardinal symptoms of muscle wounds particularly fatigue and fatigue-pain after moderate use, affecting the particular functions controlled by injured muscles.
Objective findings. Entrance and (if present) exit scars linear or relatively small and so situated as to indicate relatively short track of missile through muscle tissue; signs of moderate loss of deep fascia or muscle substance or impairment of muscle tonus, and of definite weakness or fatigue in comparative tests. (In such tests *238 the rule that with strong efforts, antagonistic muscles relax is to be applied to insure validity of tests.)
(c) Moderately severe disability of muscles.
Type of injury. Through and through or deep penetrating wound by high velocity missile of small size or large missile of low velocity, with debridement or with prolonged infection or with sloughing of soft parts, intermuscular cicatrization.
History and complaint. Service department record or other sufficient evidence showing hospitalization for prolonged period in service for treatment of wound of severe grade. Record in the file of consistent complaint of cardinal symptoms of muscle wounds. Evidence of unemployability because of inability to keep up to production standards is to be considered, if present.
Objective findings. Entrance and (if present) exit scars relatively large and so situated as to indicate track of missile through important muscle groups. Indications on palpation of moderate loss of deep fascia, or moderate loss of muscle substance or moderate loss of normal firm resistance of muscles compared with sound side. Tests of strength and endurance of muscle groups involved (compared with sound side) give positive evidence of marked or moderately severe loss.
* * * * *
§ 4.72 Rating muscle injuries.
In rating disability from injuries of the musculo-skeletal system, attention is to be given first to the deeper structures injured, bones, joints, and nerves. A compound comminuted fracture, for example, with muscle damage ■from the missile, establishes severe muscle injury, and there may be additional disability from malunion of bone, ankylosis, etc. The location of foreign bodies may establish the extent of penetration and consequent damage. It may not be too readily assumed that only one muscle, or group of muscles is damaged. A through and through injury, with muscle damage, is always at least a moderate injury, for each group of muscles damaged. This section is to be taken as establishing entitlement to rating of severe grade when there is history of compound comminuted fracture and definite muscle or tendon damage from the missile. There are locations, as in the wrist or over the tibia, where muscle damage might be minimal or damage to tendons repaired by suture, and in such cases requirements for severe ratings are not necessarily met.
*239 § 4.73 Schedule of ratings — muscle injuries.
THE SHOULDER GIRDLE AND ARM

Bating

Major Minor

6301 Group I. Extrinsic muscles of shoulder girdle. (1) Trapezius; (2) levator scapulae; (3) serratus magnus. (Function; Upward rotation of scapula. Elevators of arm above shoulder level.) Severe _ Moderately severe-Bloderate - Slight_ OOOO COCqrH OOOO CO rH
5305 Group V. Flexor muscles of the elbow. (1) Biceps; (2) brachialis; (3) braehioradialis. (Function: Supination (1) long head of biceps or stabilizer of shoulder joint. Flexion of elbow, (1, 2, 3).) Severe _ 40 Moderately severe-30 Moderate_10 Slight_ 0 30 20 10 0

Bating

5311 Group XI. Posterior and lateral crural muscles. Muscles of the calf. (1) Triceps surae (gastrocnemius and soleus) ; (2) tibialis posterior; (3) pei-oneus longus; (4) flexor hallucis longus; (5) flexor digitorum longus; (6) popliteus. (Function: Propulsion, plantar flexion of foot (1) ; stabilizing arch (2, 3) ; flexion of toes (4, 5) ; flexion of knee (6).) Severe _ Moderately severe-Moderate_ Slight_ 30 20 10 0
THE PELVIC GIRDLE AND THIGH

Bating

5313 Group XIII. Posterior thigh group. Hamstring complex of 2-joint muscles. (1) Biceps femoris; (2) semimembranosus; (3) semi-tendinosus. (Function: Extension of hip and flexion of knee. Outward and inward rotation of flexed knee. Acting with rectus femoyis and sartorius (see XIV, 1, 2) synchronizing simultaneous flexion of hip and knee and extension of hip and knee by belt-over-pulley action at knee joint.) Severe _ Moderately severe-Moderate _ Slight_ $ ‡ ‡ ‡ ‡ 40 30 10 0
*240 THE SKIN
§ 4.118 Schedule of ratings — skin.
* :J: ‡ ❖ *
7804 Scars, superficial, tender and painful on objective demonstration_ 10
note : Tlie 10 percent rating will be assigned, when the requirements are met, even though the location may be on tip of finger or toe, and the rating may exceed the amputation value for the limited involvement.
S& * * ❖ *
20. The evidence does not establish that, with respect to the defects other than the right shoulder wound, the action of the Air Force was arbitrary, capricious, or unsupported by substantial evidence. With respect to the right shoulder wound, the failure of the Air Force to rate it was legal error, as indicated in findings 21-34, and that wound should have been rated at 10 percent.
21. Frank P. Corbin, retired Brigadier General, former Air Force Judge Advocate and presently a practicing lawyer, testified on behalf of plaintiff in an expert capacity.
22. General Corbin testified that he was one of the three drafters of the Career Compensation Act of 1949, which is the subject of AFM 35-4; that, under the guidance and direction of the Hook Commission and the House Armed Services Committee, he wrote Title IV of the Act which deals with physical disability retirement and that “the hearings and all related matters thereto were actually under my legal guidance insofar as the law itself was concerned.”
23. From 1950-52, then General Corbin was the Judge Advocate member of the Physical Review Council of the Air Force, an administrative council administering Title IV of the Act. The Council’s responsibility was to review all records of all Air Force officers retired for physical disability prior to the passage of the Career Compensation Act. While he was a member, the Council reviewed between 10,000 and 20,000 records of Air Force persons retired before passage of the Career Compensation Act of 1949. After a finding of unfitness, the Council rated all disabilities and defects and applied the VA Schedule to all ratable disabilities, without exception. After *241 the passage of the Career Compensation Act of 1949 the Council reviewed all Air Force disability retirement cases. The Council could and did go outside of a retiree’s medical record to discover defects which actually existed but were not listed in the medical record. The word “contributory” was not used by the Council.
24. Prior to 1952, while AFM 35-4 was being prepared, General Corbin was legal consultant to the drafters of that manual which was issued shortly after his departure from Washington. lie advised the drafters on the subject matter of paragraph 17(a) as follows:
(a) A finding of unfitness under regulations to be promulgated by Air Force Secretary is a prerequisite to rating disabilities.
(b) After a finding of unfitness, a board would then apply the VA Schedule for Rating Disabilities. The VA “whole-man concept” shall be used in rating disabilities which means “that all defects which the man had which affect his earning a living after leaving the service would be considered by the Board and so rated.” Also, under the “whole man” concept, a series of defects, which do not render the officer individually physically disabled, shall be combined and individually rated under the VA Schedule.
(c) A contributory defect in the meaning of the regulation is one which is not disabling but which nevertheless is ratable.
(d) Zero ratings for disability could_ be used unless the VA Schedule specified a minimum rating higher than zero.
25. General Corbin was transferred from the Air Force Personnel Council in 1952 to another assignment prior to the publication of AFM 35-4. He did not advise the drafters on the use of the words “disabling and contributory.”
26. At present, General Corbin practices before various Air Force physical evaluation boards as a civilian lawyer. In his opinion, these boards follow the same procedure that was employed by the Air Force Physical Review Council in 1952. Current Air Force boards “upon a finding of unfitness by a medical board and a collaboration of those findings by the PEB, all the ratings which are included ih' the final *242 diagnosis or which are found in the history of the man as still being in existence are rated.” The PEB will go outside Air Force medical records if the evidence before the board shows that all defects have not been included in the medical record.
27. In General Corbin’s opinion, a contributory defect within the meaning of AFM 35-4, ¶ 17a (2), is one which is not disabling 'but which nevertheless is ratable. He testified that:
* * * Contributory is I believe other than the disabling defect. Contributory is anything which detracts from the whole-man concept which interferes with his earning a living after being retired from the service. * * * it contributes to the lessening of his earning power because it is a ratable disability but not disabling in itself. * * *
28. Colonel Felix J. Zaniewski was called as an expert witness on behalf of the defendant at the trial on remand of this case. He is a lawyer, admitted to practice in Connecticut, and since 1942 has been a Judge Advocate Officer in the United States Air Force. From August 1968 to July 1970, Colonel Zaniewski served as the legal member of the Air Force Physical Review Council, which meets at Randolph Air Force Base and is the only Physical Review Council in the Air Force. At the time of his testifying in this case, Colonel Zaniewski was assigned as Chief, Administrative Law Division, Field Extension, Office of the Judge Advocate General, United States Air Force Military Personnel Center, Randolph Air Force Base, Texas. Plis present duties include giving advice, on behalf of the Judge Advocate General, in cases regarding retirements, promotions, separations, and all other matters affecting military personnel, including the rendering of opinions for the Judge Advocate General to the legal members of the Physical Review Council.
29. Colonel Zaniewski testified that he was familiar with Air Force Manual, AFM 35-4, promulgated in 1952, including paragraphs 17 a (1) and (2) contained therein, as well as the current edition of AFM 35-4, promulgated in January 1969; that he reviewed the current edition of AFM 35-4 *243 for legal sufficiency prior to its promulgation in 1969; and that although the 1969 edition of AFM 35-1 is more explanatory and in greater detail, it does not purport to change the effect of the language set forth in paragraphs 17 a (1) and (2) of the 1952 edition.
30. Colonel Zaniewski testified that:
(a) After a finding of unfitness, the Physical Eeview Council rates all ratable defects in accordance with the VA Schedule for Eating Disabilities.
(b) Scars are rated by PEC if “the criteria of the Schedule are complied with.” Well healed, nonsympto-matic (W.H.N.S.) scars on unexposed parts of the body are not given a percentum rating, but superficial scars which are objectively determined to be tender and painful, as well as disfiguring scars on the head, face or neck are rated in accordance with the VA Schedule. Scars from penetrating wounds with retained foreign bodies are given consideration by the PEC, but are not of themselves ratable, since “there still has to be something that indicates some symptom.”
(c) A contributory defect in the meaning of AFM 35-4 is one which “by itself” is not disabling but which, nevertheless, is ratable.
(d) PEC can and does increase disability ratings.
(e) PEC can rate disabilities not previously rated by a Physical Evaluation Board.
_(f) PEC has rated defects which were not disabling within themselves, i.e., defects which did not render the member unfit for military service.
(g) 10 U.S.C. § 1201 et seq. (Title IV Career Compensation Act) is the basis for Air Force regulations covering retirement for physical disability.
(h) Questions of reasonable doubt are resolved in favor of a member seeking retirement for physical disability.
(i) A combination of disabilities, each of which standing alone would not be individually unfitting, when combined, could result in a conclusion of unfitness.
(j) Zero percent disability ratings are sometimes used, as where a minor impairment would in no way affect the individual’s civilian employment. But ratings specified as minimum ratings in the VA Schedule are observed.
(k) AFM 35-4 follows and conforms to Department of Defense Directive, September 9, 1968.
*244 31. Colonel Zaniewsld was familiar with, a 1950 opinion of the Judge Advocate General of the Army, JAGA 1950/ 4875, wherein was stated in part as follows:
SUBJECT: Disabilities Considered in Determining Percentum of Disability under the Career Compensation Act of 1949
1. A representative of the Judge Advocate General on the Army Physical Review Council * * * informally requested the views of this office with respect to the following question:
Having determined that a member of the Army is unfit to perform the duties of his office, rank or grade by reason of a physical disability, should the per centum of the member’s disability be assessed only on the basis of the disability which renders the member unfit, or should contributory disabilities also be taken into consideration whether or not such contributory disabilities are themselves disabling by Army standards ?
Hi ‡ ❖ *
The intent of Congress, as revealed by the foregoing legislative history, is that a member found to be unfit to perform the duties of his office according to Army standards will be compensated in proportion to the degree of his mental or physical impairment, determined by reference to standards established by the Veterans’ Administration for application in the cases of civilians. A member is either disabled or he is not; and his disability may be caused by a variety of diseases or injuries or bodily infirmities, alone or in combination, even though any one of a combination, if taken alone, would not result in disability. It would thus appear more appropriate to speak of contributory physical “defects”, rather than contributory “disability”. The use of such nomenclature would obviate the question presented by this reference.
* $ $ # #
Based upon the foregoing discussion, it is believed that it must be concluded that the Department of the Army should determine the unfitness or its members for military service in accordance with its own standards, but that, having determined that the member is unfit, it should then determine his percentum of disability on the basis of his ability to provide for himself in civilian life, taking into consideration not only those disabilities *245 which unfit him for military service, hut also any other disabilities rated in the standard schedule for rating disabilities of the Veterans’ Administration.
Representatives of the Judge Advocates General of the Air Force * * * and the Navy * * * informally concur in the foregoing conclusion.
3. The foregoing conclusions have been discussed informally with the representatives of the Judge Advocate General on the Physical Review Council * * * and they have stated that they concur, and that the principles hereinbefore set out will be followed by that agency.
32- Colonel ZaniewsM testified that from personal knowledge the policy referred to in the conclusion of JAGA 1950/4875, supra, was followed by the Department of the Air Force from 1968 to the present time; and that he presumed this policy was followed from 1952 to 1958, when he became the legal member of the Physical Review Council, on the basis of his familiarity in Government affairs.
33. Department of Defense Directive Number 1332.18 dated September 9, 1968, on the subject of “Uniform Interpretation of Laws Relating to Separation from the Military Service by Reason of Physical Disability”, applicable to all military branches, provides as follows at page 3:
V. POLICIES
A. Standards of TJnfitness by Reason of Physical Disability
1. The mere presence of an impairment does not, of itself, justify a finding of unfitness because of physical disability. In each case considered, it is necessary to correlate the nature and degree of physical disability which is present with the requirements of the duties which the member reasonably may be expected to perform by virtue of his office, grade, rank, or rating.
a. The overall effect of all disabilities present in an individual whose physical fitness is under evaluation must be considered both from the standpoint of how the disabilities affect the individual’s performance, and requirements which may be imposed on the service concerned to maintain and protect him during future duty assignments. An individual may be unfit because of physical disability caused by a single impairment, or physical disability resulting from the overall effect of two or *246 more impairments even -though, no one of them, alone, would cause unfitness.
b. While there are many ways in which physical disability may affect an individual’s capacity to perform duty, any listing of these factors should not be interpreted as limiting a Military Department Secretary in applying the many principles of “unfitness by reason of disability”. Application of these principles is a prerogative of the Secretary of the Military Department concerned.
34. Chapter 3 of AFM 36-4, entitled “Physical Evaluation Boards”, provides in paragraph 3-54 under date of June 4, 1970, as follows:
3-54. Zero Percent Ratings and Minimum Ratings:
a. Zero Percent Rating. Occasionally a medical condition which causes or contributes to unfitness for military service is of such mild degree that it does not meet the criteria even for the lowest rating provided in the VA Schedule under the applicable code number. A zero percent rating may be applied in such cases even though the lowest rating listed is 10 percent or more except when “minimum ratings” are specified. It should be noted that the zero percent rating does not preclude the award of compensation as prescribed by law for ratings of less than 30 percent.
b. Minimum Ratings. In some instances the VA Schedule provides a “minimum rating” without qualification as to residuals or impairment. Syringomyelia, code 8024, is an example. Diagnosis alone is sufficient to justify the minimum rating. Higher ratings may be awarded in consonance with degree of severity, but no rating lower than the “minimum” may be used if the diagnosis is satisfactorily established.
c. Minimum Ratings for Residuals. The VA Schedule provides for minimum rating for residuals in certain medical conditions. The instructions may be “rate residuals, minimum_” or may specify what impairment to rate and give a minimum rating for that impairment. Examples are code 8011, anterior poliomyelitis, and 6025, benign new growth of eyeball and adnexa, other than superficial. To justify the minimum rating for residuals, a functional impairment, or other residuals caused by the condition must exist, Otherwise a zero percent rating is appropriate.
*247 CONCLUSION of Law
Upon tlie foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to a judgment on liability, with the amount of recovery to be determined pursuant to Eule 131 (c).

 Section 402(h) of the Career Compensation Act of 1949, 63 Stat. 802, 817, 37 U.S.C. 272 (b) (1952 ed.), provides as follows:
“Upon a determination by the Secretary concerned (1) that a member of a Regular component of the uniformed services entitled to receive basic pay, or a member of a Reserve component of the uniformed services entitled to receive basic pay who has been called or ordered to extended active duty for a period in excess of thirty days, is unfit to perform the duties of his office, rank, grade, or rating, by reason of physical disability incurred while entitled to receive basic pay; (2) that such disability is not due to the intentional misconduct or willful neglect of such member and that such disability was not incurred during a period of unauthorized absence of such member; (3) that such disability is 30 per centum or more in accordance with the standard schedule of rating disabilities in current use by the Veterans’ Administration; (4) that such member has completed at least eight years of active service as defined in section 282 of this title; and (5) that accepted medical principles indicate that such disability may be of a permanent nature, the name of such member shall be placed upon the temporary disability retired list of his service by the Secretary concerned and such members shall be entitled to receive disability retirement pay as prescribed in subsection (d) of this section: Provides,, That if condition (5) above is met by a finding that such disability is of a permanent nature, such member may be retired by the Secretary concerned and, upon retirement, shall
Eootnote continued on following page. *204 be entitled to receive disability retirement pay as prescribed in subsection (d) of this section: Provided further, That if condition, (3) above Is not met because the disability is determined to be less than 30 per centum, the member concerned shall not be eligible for any disability retirement provided in this section, but may be separated for physical disability from the service concerned and upon separation shall be entitled to receive disability severance pay os prescribed in section 273i of this title: And provided further, That regardless of the percentage of disability determined: to have been incurred, if condition (4) above is not met because the member concerned has completed less than eight years of active service as defined in section' 282 of this title at the time he would otherwise have been retired pursuant to this subsection, the member concerned shall not be eligible for any disability retirement provided in this section, but may be separated for physical disabiUty from the service concerned and upon separation shall be entitled to receive disability severance pay as prescribed in section 273 of this title.’’

 Tie common peroneal nerve referred to by the Veterans Administration Is the same as the external popliteal nerve referred to by the Air Force.

 The report of the late Commissioner Arens contained findings numbered serially 1 through 20 based on the record before him. The present report contains findings which are numbered commencing with finding 21 based on the record of proceedings on remand. Rinding 20, should be stricken.

 “c. Basis for Arriving at Findings. Since the disability of an evaluee may be comprised of one or more disabling defects; a combination of one or more disabling and contributory defects, or an accumulation of contributory defects; the determinations of the board with respect to physical defects, as outlined in a above, may be considered as preliminary steps necessary to the establishment of a basis for arriving at recommended findings with respect to the evaluee’s disability. Accordingly, having identified the physical defects which constitute the disability, including all disabling and contributory defects, the board then will proceed to make recommended findings with respect to the disability, as follows;
*****
“(d) The percentage of disability in accordance with the standard schedule of rating disabilities in current use by the Veterans’ Administration.”

 The VA Schedule is not all-inclusive In Its listing of physical defects. As to conditions which are not specifically listed under diagnostic code numbers, paragraph 20 of the Schedule, headed “General Policy in Rating Disability,” authorizes the rating of such unlisted conditions by analogy under a closely related disease or injury.

 Paragraph 3 of “General Policy In Rating Disability” chapter in the VA Schedule.

 Code numbers 5804 and 5305 apply a rating of 10 percent to a moderate degree of disability from the described condition. Code number 7804 provides a flat rating of 10 percent to all conditions complying with the description.

 37 U.S.C. 272(b) (1952 ed.).